## FISHGOLD v. SULLIVAN DRYDOCK & REPAIR CORPORATION (GRANATA, Intervener).

### No. 196.

Writ of Certiorari Granted April 1, 1946.
See 66 S.Ct. 904.

Circuit Court of Appeals, Second Circuit.
March 4, 1946.

---

CHASE, Circuit Judge, dissenting.

———◆———

M. H. Goldstein and William L. Standard, both of New York City (Herman Rosenfeld, of New York City, of counsel), for appellant Roy Granata.

Knowlton Durham, of New York City, for respondent.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (John F. Sonnett, Asst. Atty. Gen., Robert L. Werner and Searcy L. Johnson, Sp. Assts. to Atty. Gen., and Cecelia Goetz, of Washington, D. C., of counsel), for the United States, movant.

Lee Pressman, of Washington, D. C., and Witt & Cammer, of New York City (Eugene Cotton and Frank Donner, both of Washington, D. C., of counsel), for Congress of Industrial Organizations, amicus curiae.

Samuel J. Cohen, of New York City, and Frank L. Mulholland, Clarence M. Mulhol-

land, and Willard H. McEwen, all of Toledo, Ohio (Mulholland, Robie & McEwen, of Toledo, Ohio, of counsel), for Railway Labor Executives' Ass'n, amicus curiae.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Local 13 of the Industrial Union of Marine and Shipbuilding Workers of America appeals from a judgment awarding damages to the plaintiff for his loss of wages because of two lay-offs by his employer, the Sullivan Drydock and Repair Corporation, against which alone the action was brought. The union intervened, and charged itself with the defence; the United States, the Railway Labor Executives Association and the Congress of Industrial Organizations have filed briefs, as amici. The appeal raises only the proper interpretation of subdivision (b) and (c) of § 8 of the Selective Training and Service Act of 1940, as amended in 1944 (§ 308(b) and § 308(c), 50 U.S.C.A. Appendix, which we quote in the margin).[1] The facts as found by the judge were as follows.

The plaintiff entered the employ of the Sullivan Drydock and Repair Corporation as a welder, on December 21, 1942, and was steadily employed as such until May 22, 1943, when he was inducted into the Army. He served until July 12, 1944, and was then honorably discharged, and received a certificate of the kind described in § 8(a), 50 U.S.C.A. Appendix § 308(a). At that time he concededly was, and he has since been, qualified as a first-class welder; and the company restored him to this former position on August 21, 1944, and has never dismissed him. The controversy here at bar arises because on three occasions: Viz., on April 9, April 11, and from May 17 to May 24, inclusive, it refused to give him any work, because there was not enough on those days to occupy all hands. In so refusing it preferred other welders, not veterans, who had a higher shop seniority than the plaintiff: this in accordance with the agreement between the company and the union. The plaintiff's position is that, as a veteran, § 8(b) and (c) gave him priority over all his fellows except other veterans; the union's position is that those sections merely restored him to the same place in the shop hierarchy which he would have had, if he had been on leave of absence during the period of his service. The judge held with the plaintiff and the union appealed.

Subsection B of § 8(b) is the operative source of the privilege on which the plaintiff relies; it reads as follows: "Such employer shall restore such person to such position or to a position of like seniority, status and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so." "Such position" is nowhere defined except as "a position other than a temporary position, in the employ of any employer." Taking this clause by itself, it seems to us beyond debate that it was not intended that the veteran should gain in seniority. It will be observed that the grant is in the alternative: he is to be "restored" to his original position, or to one of "like

[1] "8(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

"(A) if such position was in the employ of the United States Government, its Territories or possessions, or the District of Columbia, such person shall be restored to such position or to a position of like seniority, status, and pay;

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so."

"8(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration."

seniority, status and pay," whenever possible. The phrase, "like seniority" means the "same seniority" as before; and it necessarily precludes any gain in seniority. It follows that, if the original position is no longer open, the substitute shall be a position of no greater, though no less, seniority than the lost position. But if that be true, there can be no implication that, if the original position be not lost, but be still available, the veteran shall be restored to it with a gain in priority; for that would pre-suppose that Congress did not intend the substitute to be as nearly a complete substitute for the lost original as it was possible to make it, a hypothesis absurd on its face. Hence we must start with the proposition that subsection B of § 8(b) not only did not grant any step up in seniority, but positively denied any.

Subdivision (c) confirms the intention so disclosed. As subsection B reads, it would probably be understood to restore the veteran only to that same position which he held when he was inducted. That was, however, thought to be unfair; for while he was in the service, there were likely to be such changes in the personnel that when he came back, he might find himself junior to those over whom he had had priority when he left. To remedy this, by an amendment made while the bill was in Congress, he was given the same status that he would have had, if he had been "on furlough or leave of absence" while he was in the service. How far that differed from his position, had he remained actively at work, does not appear; but clearly the amendment presupposed that a difference there might be. Having in this way declared how the veteran's interim position "shall be considered," Congress added that he should be "restored without loss of seniority." Had the purpose been, not only to insure the veteran that he should not lose any more steps upon the ladder than if he had been on leave, but also that he should go to the top, we cannot conceive that Congress would have expressed itself in the words, "without loss of seniority." They have no such express meaning, and their implications are directly the opposite; for they disclose a concern against his possible demotion inconsistent with any implied belief in his promotion. For these reasons we are satisfied that, except for the concluding phrase of subdivision (c) there can be no doubt that textually the union's construction is the right one.

It remains to consider that phrase which, as we understand it, is the chief reliance of those who take the opposite view.

 It declares that the veteran "shall not be discharged 'from such position within one year after such restoration"; and we should, so far as possible, interpret it so as not to conflict with the rest of the section; in particular, so as to leave untouched the privilege of seniority, as it is earlier defined. There is no difficulty in doing so, if "discharge" means a permanent end to the relation of employment, a separation, a dismissal; and that is indeed its ordinary meaning. For example, the Oxford Dictionary (Vol. II, p. 412, subtitle "Discharge" I, 3), reads: "To relieve of a charge or office; (more usually) to dismiss from office, service or employment; to cashier": this in distinction with "Layoff," (Supplement, p. 8): "A period during which a workman is temporarily dismissed or allowed to leave his work; that part or season of the year during which activity in a particular business or game is partly or completely suspended; an off-season." It seems to us that Congress used "discharge" in this sense: i.e., that the veteran was to be assured of his job for the same period—a year—for which he was to be drafted; but that the job to which he was "restored"—as that very word implies—was to be subject to the same conditions to which the old job had been subject, with only the exception that it should be better in so far as a leave of absence for the year might improve it. The value of that assurance would indeed vary. In a closed shop it would presumably add little, for the union would not allow a member to be discharged without cause anyway. In an open shop the same would be true, if it were partly unionized, and the veteran were in the union; but, whenever for any reason he had not that protection it prevented his being turned out, so long as he behaved himself, and that was an advantage of no mean importance. We do not know what proportion of those in industry are not in unions; but their number is certainly very large, and, even though the clause was of value only to them, they are numerous enough to give it a purpose; to say nothing of the possibility that statutory protection may be an important supplement to union protection.

[5] When we consider the situation at the time that the Act was passed—September, 1940—it is extremely improbable

that Congress should have meant to grant any broader privilege than as we are measuring it. It is true that the nation had become deeply disturbed at its defenseless position, and had begun to make ready; but it was not at war, and the issue still hung in the balance whether it ever would be at war. If we carry ourselves back to that summer and autumn, we shall recall that the presidential campaigns of both parties avoided commitment upon that question, and that each candidate particularly insisted that no troops should be sent overseas. The original act limited service to one year, and it was most improbable that within that time we should be called upon to fight upon our own soil; as indeed the event proved, for we were still at peace in September, 1941. Congress was calling young men to the colors to give them an adequate preparation for our defence, but with no forecast of the appalling experiences which they were later to undergo. Against that background it is not likely that a proposal would then have been accepted which gave industrial priority, regardless of their length of employment, to unmarried men—for the most part under thirty—over men in the thirties, forties or fifties, who had wives and children dependent upon them. Today, in the light of what has happened, the privilege then granted may appear an altogether inadequate equivalent for their services; but we have not to decide what is now proper; we are to reconstruct, as best we may, what was the purpose of Congress when it used the words in which § 8(b) and § 8(c) were cast.

The plaintiff argues, however, that, regardless of their original scope, these sections have in any event by administrative interpretation and by later legislation, taken on the meaning which he claims. We shall consider first the administrative interpretations. Section 8(g) directs the Director of Selective Service to establish a "Personnel Division" which shall "render aid in the replacement in their former positions of, or in securing positions for * * persons who have satisfactorily completed any period of their training and service under this Act," and on March 5, 1944, the Director issued a memorandum (No. 190-A, Part IV, § 4(b)), which read: "A veteran who has been reinstated to his former position cannot be displaced by another on the ground that the latter has greater seniority rights." Section 8(e) di-

rects the proper district attorney, "if reasonably satisfied" that a veteran "is entitled" to the benefits of the Act, to "appear and act as attorney" for him to enforce his rights; and the Attorney General, as appears from his intervention as amicus in this action, has read the law like the Director of Selective Service. On the other hand, the National War Labor Board adopted the opposite view in In Re Scovill Manufacturing Co., 21 W.L.R. 200; as have several of its arbitrators; and the Solicitor of the Department of Labor did the same in an instruction for the guidance of federal conciliators in dealing with war veterans (16 L.R.R. 481).

So far as we can find, these are the only interpretative rulings that have as yet appeared by officials who can be said to have been charged with any duty in administering the Act; and it can hardly be said that they have had that consistency to which we should yield our judgment. We do not forget that the canon which the plaintiff invokes is not confined to decisions inter partes, like those of the Federal Trade Commission, the Interstate Commerce Commission, the Labor Board, or the Tax Court; it extends also to the interpretations of officials, charged with the duty of enforcing statutes. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161; Great Northern R. Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836. Whether the weight to be given to such rulings is less than to regulations for the conduct of, or decisions in, contested cases, has never been expressly decided, though was intimated in Skidmore v. Swift, supra, 323 U.S. at page 139, 65 S.Ct. at page 164; and see Judge Frank's dissent in Duquesne Warehouse v. Railroad Retirement Board, 2 Cir., 148 F.2d 473, 485–487. There is indeed a basis for making such a distinction because the position of a public officer, charged with the enforcement of a law, is different from one who must decide a dispute. If there is a fair doubt, his duty is to present the case for the side which he represents, and leave decision to the court, or the administrative tribunal, upon which lies the responsibility of decision. If he surrenders a plausible construction, it will, at least it may, be surrendered forever; and yet it may be right. Since such rulings need not have the detachment of a judicial, or semi-judicial decision, and may properly carry a bias, it would seem that they should not be as authoritative; and of this sort

were the rulings of the Director and the Attorney General in the case at bar, unlike the decisions of the War Labor Board and the direction of the Solicitor of the Labor Department. Be that as it may, concededly all such considerations are only cautionary, and not authoritative; for in the end, after whatever reserve, upon the courts rests the ultimate responsibility of declaring what a statute means: as the Supreme Court recognized in its last word upon the subject. Jewell Ridge Coal Corp. v. Local, 325 U.S. 161, 65 S.Ct. 1063. We should have to be in much greater doubt than we are, if we were to yield, even to a more uniform administrative interpretation than exists here.

There remains the question whether the amendment of §8 in December, 1944, 50 U.S.C.A.Appendix § 308, and the extension of the whole act until May 15, 1946, is to be taken as embodying the Director's position. The amendment, taken alone, only extended the time within which a veteran might apply for reinstatement from forty days to ninety days, and made that period begin from the termination of "hospitalization continuing after discharge for a period of not more than one year," if he was in a hospital. Of itself this indicated no other change in intent; but the Director's ruling had been made for over six months in December, 1944. Moreover, Colonel Keesling, of the Director's office, in one part of his testimony before the subcommittee of the Committee on Military Affairs, stated the Director's position. His later remarks were, perhaps, somewhat ambiguous, and we are left in doubt as to the final impression which his testimony as a whole may have left on the subcommittee. After he had first mentioned the subject, the presiding chair-

man, Mr. Costello, wished to revert to it, and the Colonel thereupon read the Act as it stood, and a colloquy ensued which we quote in the margin.[2] He was then speaking of the fact that the veteran's absence from the shop should be counted as though he were on leave, or on furlough; and whether his hearers assumed that this was consistent with what he had said before, or supplanted it, is not entirely certain.

However, we cannot in any event assimilate the situation to that to which courts so frequently resort in aid of the interpretation of ambiguous language; i.e., reenactment without change after administrative interpretation. McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 492, 51 S.Ct. 510, 75 L.Ed. 1183; National Lead Co. v. United States, 252 U.S. 140, 146, 40 S.Ct. 237, 64 L.Ed. 496; Massachusetts Mutual Life Insurance Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 77 L. Ed. 739. The rationale of that canon must be, either that those in charge of the amendment are familiar with existing rulings, or that they mean to incorporate them, whatever they may be. The second would hardly be tenable; we should hesitate to say that Congress might enact as law regulatory provisions with which it concededly had no acquaintance. On the other hand, if we are to suppose, in the absence of evidence to the contrary, that Congress is familiar with all existing administrative interpretations, and is content to accept them when it makes no change, it would seem that the force of that assumption should vary with the circumstances. For example, successive recensions of the Internal Revenue Act are the result of detailed conferences between the Treasury and the committees of Congress;

2 "Mr. Johnson: And the time he serves in the armed forces does not affect his seniority?

"Colonel Keesling: That is right. He shall be restored without loss of seniority.

"Mr. Harness: Does that mean he does not lose any of the seniority he has acquired up to the time of his induction, or that he gets that seniority that has accrued to him while he was working, plus the time he served in the Army?

"Colonel Keesling: The latter is right.

"Mr. Harness: Whose construction is that?

"Colonel Keesling: Ours. The language is clear. It says that a person so restored shall be restored without loss of seniority.

"Mr. Johnson: It is not clear that that means his former seniority.

"Colonel Keesling: Would it not be loss of seniority if a nonveteran increased his seniority by 2 years without crediting an employee with 2 years' seniority for the 2 years he spent in the armed forces?

"Mr. Johnson: It might mean without loss of what he had before.

"Colonel Keesling: That is not the way we have construed it.

"There has not been any difference of opinion on that as far as the labor groups are concerned. The act says any person who is restored shall be restored without loss of seniority."

and there is good reason to assume that, in so far as the statute is not changed, existing regulations and even less formal interpretations are expressly affirmed. That may well be a proper inference in the case of all general recensions, accompanied as these ordinarily are by continuous and intimate consultation with administrative officers. But it would seem hazardous to carry such a conclusion to the situation here at bar. So far as concerns any actual information conveyed to Congress, it was at most confined to the occasion which we have discussed, for it would be gratuitous to suppose that the same information ever reached the Senate Committee of Military Affairs. That aside, the same ambiguity arises here, if we were to impute to Congress a knowledge of all administrative rulings, as arises from the rulings themselves, for the decisions of the National Labor Relations Board and of the Solicitor of the Labor Department both preceded the amendment of § 8(c). To suppose that Congress was familiar with one set of rulings and not with the other would be baseless in fact, and involve the canon in greater uncertainty than already attaches to its use, which—be it said with all deference—is by no means negligible. We should be clutching at straws and relying on phantoms, if we were to suppose that the re-enactment of this section with its very specific amendment was intended to effect so vital a change in industrial relations. Certainly we should be unwarranted in believing that Congress would have made so far reaching a change without notice to those who had an interest equal with the veterans themselves—the unions. Finally, as in the case of the effect of such rulings unaccompanied by any amendment of the statute, when all is said, the canon is only a help when the intent is otherwise in doubt; and, after every allowance for the differences which have actually arisen, we cannot bring ourselves to abandon the construction we have adopted. As for judicial interpretation, this is the first appeal; and the only decisions in the district courts are apparently equally divided. Whirls v. The Trailmobile Co., D.C.S.D.Ohio, 64 F. Supp. 713, is against the view we take; Olin Industries Inc. v. Barnett, D.C.S.D. Ill., 64 F.Supp. 722 is in accord. The fact that we are ourselves not agreed cautions us that we should not be too sure of our conclusion; and obviously the really important matter is that the question should reach the Supreme Court as soon as possible.

We cannot conclude without expressing the hope, though it may not be realized, that our decision may not be taken as indicating any indifference to the claims of those who stood by the nation in the hour of its need at the hazard, and so often with the loss, of all that life holds dear.

Judgment reversed; complaint dismissed.

CHASE, Circuit Judge (dissenting).

I cannot believe that § 8(b) and (c) of the Selective Service Act as amended, 50 U.S.C.A.Appendix § 308(b, c), has been given the effect intended by Congress. It has been construed to mean that an honorably discharged veteran is entitled upon timely application to be restored to his old job, such a job having, as here, continued to exist, and to keep it for a year unless discharged for cause only if his employer has not by contract with a third party otherwise agreed. That seems to be too narrow a construction to put upon a remedial statute which ought to be interpreted liberally in favor of the veterans for whose benefit it was enacted. See Boone v. Lightner, 319 U.S. 561, 575, 63 S.Ct. 1223, 87 L. Ed. 1587.

There is no real controversy between the appellee and his employer who took no appeal and who had previously restored to the veteran the position he had formerly held; had kept him continuously at work in it for about seven months; and would presumably have continued so to do for at least a year but for action by the intervening union. The latter which is the sole appellant insisted that it had the contractual right to have the veteran displaced whenever necessary to make room for a nonveteran union member who had been employed about a month and a half before the plaintiff had originally been hired and the employer yielded to this demand. The ability of the plaintiff to do the work is unquestioned and it is not even intimated that he gave any cause for discharge.

Thus the clear cut issue is whether Congress intended by this statute to make sure that those who were required by it to terminate their non-temporary employment and serve in the armed forces should also be entitled by it to resume their former employment, or the equivalent, and keep that for a year after their honorable discharge from service, provided they were

792

and continued to be able and willing to fill the position satisfactorily; or whether Congress merely left this appellee and others like him with nothing but the right to have their time in the armed forces counted as time worked for their old employers as they competed with others not displaced by the statute, for their old jobs, or ones as good, according to whatever standards of competition their employers and some third party by contract saw fit to impose upon them. And if the correct construction of the statute be that Congress intended to let returned veterans try to readjust themselves as best they might with only an unimpaired "seniority status," and not, when there were such jobs, an actual job with actual pay on which they could live at least for a year, I must say with all deference, that words were used which have virtually to be read out of the statute so to restrict its meaning.

Congress first provided in § 8(b) (A) and (B) of the statute for the kind of positions honorably discharged veterans should get. They should be restored (1) to their former positions. In providing for that seniority was not even mentioned. Then (2) in the alternative to give the equivalent to men whose former positions were non-existent, it was provided that the veteran be given a position "of like seniority, status, and pay." The words just quoted are those defining not some relative "position" in a figurative line of men available for work but a position in which the veteran could actually work. The words "a position of like seniority, status, and pay" are but the equivalent in their setting of "a job just as good with equal pay." Moreover, the definition of the alternative position plays no proper part in this case anyway since the appellee was restored to his old position and I mention it only because it seems to have been relied on as some justification for construing § 8(c) as the majority has done. It is there that the decisive provision is found.

After having made it plain in § 8(b) that the veteran should get his old job back or be offered one as good, Congress next in § 8(c) made equally clear in plain language that certain privileges went with the job. They are of two kinds. The first is that the position carries with it the right of the former employee thus re-employed to be treated as though he had been "on furlough or leave of absence during his period of training and service in the land or naval forces" and accordingly he shall suffer no "loss of seniority, (and) shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence with the employer at the time such person was inducted into such forces. * * *" Thus far the returned veteran is given but the status of an employee who has been furloughed or given a leave of absence without actual termination of employment and I agree that his insurance or other like beneficial status is to be determined under the rules and regulations applicable thereto when he was inducted and that for this purpose the statute requires it to be done on the basis of no loss of his seniority while away. Yet only in that respect was seniority made to count and then only negatively in that no loss should be suffered by any relative diminution of it because of absence. Then Congress, not content to provide that much and no more, in § 8(c), also gave the veteran another and different kind of privilege which was not made dependent in any way upon his seniority status as an employee or upon his rights as such an employee on furlough or on leave of absence. It is an added and independent right conferred in clear and plain words which people who want to express their thought unmistakably customarily use. They are "and shall not be discharged from such position without cause within one year after such restoration." Unless these words mean that after an honorably discharged veteran has been given the position to which he is entitled under the statute he may keep at work in it for a year provided there is such work to be done and he gives no cause for his discharge, I submit they mean nothing.

Congress was here prohibiting not merely discharge from employment but discharge from "such position." It did not leave the employer free, to "lay-off" the re-employed veteran at will, or shift him from one position to another not as good, or otherwise deprive him of the particular kind of work and pay to which he had been "restored." It gave the veteran a year of security in this position before he could be ousted from it simply because someone had a contract with the employer which, but for the statute, gave him a senior right to it. To deny the veteran the right to work in that position during the year is a "discharge" from it for the pe-

riod of his deprivation and calling such action a "lay-off" or anything else one may choose for a name neither alters the fact nor justifies the action. Such a choice of labels is simply what should be recognized as a futile attempt to circumvent the statute.

Moreover, if this to me seemingly plain and simple language may fairly be said to have had at first some ambiguity lurking in it, the interpretation of it by the Director of Selective Service should be enough to clear that up for present purposes. It was made by the Director in performing the duties the statute required him to perform and though not of course binding upon the courts it is entitled to the same respect that is now customarily given like interpretations of statutes by other administrative officers acting in the performance of their duty. That interpretation alone would be most persuasive for it was at least a reasonable one. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161; Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Great Northern R. Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836; Baze v. Scott, 10 Cir., 106 F.2d 365. But it doesn't stand alone. After it was well and widely known that it had been made, Congress by the re-enactment of § 8(c) without change gave potent evidence in addition to the words themselves that it meant what it said in § 8(c) when it said that "Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) * * * shall not be discharged from such position without cause within one year after such restoration." See United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673; McCaughn v. Hershey Choc. Co., 283 U.S. 488, 51 S.Ct. 210, 75 L. Ed. 1183; National Lead Co. v. United States, 252 U.S. 140, 40 S.Ct. 237, 64 L.Ed. 496; Massachusetts Mut. Life Ins. Co. v. United States, 288 U.S. 269, 53 S.Ct. 337, 77 L.Ed. 739.

Undoubtedly Congress could by statute override private contracts between employers and employees or those acting for them. It did so when under the Selective Service Act men holding positions of employment were inducted. It could, as it did, displace others later whenever necessary to make room for veterans qualified for and seeking their old positions.

And finally Congress passed this statute for the benefit alike of all honorably discharged veterans who had been taken from employment more stable than what is called temporary. There is no discernible purpose not to treat them all the same and no good reason why Congress should not have intended to make a man who was inducted from a closed shop as secure in his job during the first year after his return as a man inducted from an open shop would be. One as much as the other would need this adjustment period before facing the full brunt of competition for his job. I think Congress has by word and act well demonstrated its purpose to provide for equality of treatment in this respect regardless of private contracts made by any employer with anybody.

I dissent.