Morris MILLER, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15969.

United States Court of Appeals
Fifth Circuit.

Nov. 2, 1956.

Hal Lindsay, Atlanta, Ga., for petitioner.

Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., John Potts Barnes, Chief Counsel, Int. Rev. Ser., Rollin H. Transue, Sp. Atty., I. Henry Kutz, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

In this petition for review of a decision of the Tax Court there are three important questions: 1. Is an income tax return signed by the taxpayer's wife, at his instance, in the presence of the ac-

countant who prepared it and whose tacit approval was given to this method of signing, such a return as would commence the running of the statute of limitations; 2. Did the filing of a return signed in such manner satisfy the requirements as to timely filing of a return so as to prevent the imposition of the negligence penalty for late filing; and 3. Did the Tax Court correctly determine the taxable income of petitioner for the years in question by accepting the basic determination of the Commissioner (made in the absence of books and records truly reflecting his income) by making substantial adjustments in favor of the taxpayer by application of its own formula of increasing allowable deductions, instead of accepting the taxpayer's computations on increase in net worth or some other allegedly more accurate method?

There is a subsidiary question arising from the Tax Court's refusal to reopen the record after it had concluded the hearing on the merits and had made its findings of fact and rendered its conclusion of law, to permit the taxpayer to amend his petition to allege that the assessment for 1943 had been barred by the Statute of Limitations (assuming that question 1 above is to be answered in the affirmative).

The case originated when the Commissioner issued a deficiency letter asserting that the taxpayer had understated his income taxes for the years 1943, 1944, 1945, 1946 and 1947 by some $59,000; that he was subject to a fraud penalty of $34,000 and over $9,000 in other penalties. The facts as brought out in the Tax Court are briefly as follows:

During the calendar years 1943 to 1947, inclusive, Morris Miller, referred to as the taxpayer, operated a beer parlor, lunch counter and pool hall known as the Marietta Buffet in Atlanta, Georgia. During those years he was married to, and living with, Dora G. Miller, with legal residence in Atlanta. Dora G. Miller filed no separate tax returns for the period in question.

The taxpayer filed timely individual income tax returns for 1944 and 1946. On March 14, 1944, March 15, 1946, and March 15, 1948, documents purporting to be returns for 1943, 1945, and 1947, respectively, were filed, bearing the caption "Morris Miller." The taxpayer did not sign these purported returns. The signature line of the purported return for 1943 bore the inscription "Morris Miller by Mrs. M. Miller." The signature line of the purported return for 1945 bore the inscription "Morris Miller." The signature line of the purported return for 1947 bore the inscription "Morris Miller by D. G. Miller." All of the inscriptions were affixed by the taxpayer's wife, upon his oral authorization and direction, at the place on the return pointed out by the accountant who had prepared the return.

The taxpayer was not physically incapacitated and was not outside the continental limits of the United States during any of the years 1943 to 1947, inclusive. Dora G. Miller did not have a power of attorney to sign any of his tax returns for him.

In connection with the examination of the taxpayer's income tax returns for the period in question, the revenue agent was informed that the books and records had been destroyed because it had not been thought necessary to keep them any longer. The agent then began an analysis of all of the taxpayer's financial affairs from third party records, and a computation of income upon an analysis of bank deposits. Frequent regular deposits, at least weekly, were made in the bank accounts, and the agent concluded there was a direct relationship between the deposits and the taxpayer's income.

The agent rejected the idea of computing the taxpayer's net income by the so-called net worth method because, he testified, he was unable to procure sufficient, trustworthy information to enable him to verify the taxpayer's asserted beginning net worth as of January 1, 1943.

Shortly after the revenue agent's examination had begun, the taxpayer employed a certified public accountant, to make a computation of his income for

each of the taxable years. This accountant received a number of invoices and some books and records from the taxpayer. However, he regarded these as wholly inadequate for the purpose of computing the taxpayer's net income, and decided to employ the so-called net worth method. In a computation of the taxpayer's total assets on hand as of January 1, 1943, he used a figure of $25,000 for cash on hand. That figure, which he did not independently verify, was based on the taxpayer's representation that he had that amount in his safe on that date.

On the basis of the taxpayer's figures arrived at from the increase in his net worth, he filed an amended return for each of the years in question admitting an understatement for the five years of approximately $20,000 in income.

Thereafter, the Commissioner issued his ninety-day letter asserting income deficiencies totalling $125,299.26 on the basis of the original returns for the five years, and imposing fraud and negligence penalties.

The taxpayer's income was reconstructed by the Internal Revenue agent by what is known as the bank deposit method. This was made possible by the fact that all of the bank statements were available, but none of the cancelled checks for 1943 through 1946. He considered that the taxpayer deposited all of his receipts after having disbursed all of his expenses from the cash drawer, but that he frequently drew out by check amounts in even hundreds of dollars or amounts in excess of $100 divisible by 25 for his cash drawer revolving fund. He recognized that taxpayer cashed many checks out of his cash. He therefore deducted from the bank deposits all withdrawals shown on the bank statements as being for multiples of $100 or for an amount in excess of $100 if divisible by 25. This was done on the agent's theory that all such disbursements were to the taxpayer and were used by him to pay for deductible expenses or to cash customers' checks, in which case the amount would show up again as income when the cashed checks were later deposited.

The method of computing taxpayer's true income used by the Commissioner would, of course, be accurate if it was proven that all of taxpayer's deductible expenses were paid by him by cash from his revolving fund; that his revolving fund was replenished solely by checks drawn on his bank account of the denominations selected by the agent; and that all of the net proceeds from sales went regularly into the bank account. The taxpayer, both before the Tax Court and here, asserts that the first assumption was incorrect. Principally he insists that he paid many thousands of dollars of deductible expenses each year by check, and it is conceded by the Government that no account was taken by the Commissioner of these amounts for any year except the year 1947, for which the actual checks were available. For this year this category of deductible items amounted to $8,228.70. As to the other years, the agent testified:

"In the computation of income for the years 1943 through 1946, the handicap was that we did not have the canceled checks, or, in fact, any record whatsoever, invoices or otherwise, which would permit any type of analysis as to what the taxpayer had paid by check.

"In the absence of such checks, it's virtually impossible for anyone to say that he had paid a definite amount of expenses by check. It is my opinion that the extent of any purchases they had paid by check would have been resolved by arbitration between the parties, and I don't believe that has reached a satisfactory stage in this case."

As this became apparent to the Tax Court, it was obvious that one of the essential assumptions on which the Government rested its case was lacking. Referring to the $8,228.70, the court said:

"Now, it may well be argued by the Petitioner that at least that much should be found as having been expended in a similar manner for these other years. He may argue a greater amount. I don't know. That's a

question of argument. Now, Respondent will probably argue for lack of evidence nothing should be allowed in that respect, but it seems to me the Court will have as one of its tasks, if it should adopt the bank deposits method as the best method, would have to reduce these gross figures by some amount that the Court would determine as having been paid by check. I don't think the Court could possibly assume that in the year 1947 some 12 or 13 percent was paid in that manner and nothing paid in that manner in prior years * * *."

The court, in its findings of fact, accepted the bank deposit method of computation, but made substantial deductions from the Commissioner's figures for the years 1943 through 1946, without expressly stating the formula which it applied to reach the figures of taxable income for each of the years in question. It made a slight upward revision for 1947.

The Tax Court found in favor of the taxpayer on the fraud issue, but upheld the imposition of the negligence penalty.

After the Tax Court filed its findings of fact and conclusions of law, the taxpayer moved for the first time for leave to file an amendment setting up the bar of the statute of limitations for the year 1943, asserting that counsel had belatedly discovered the absence of a waiver for that year, and asserting that if permitted to file an answer to the motion, the Government would be obligated, in fact and in law, to admit that the reopening of the 1943 taxes was barred by the statute of limitations. The Tax Court denied the motion and declined to permit the assertion of the defense, assigning as one of the grounds therefor that the granting of the motion would be of no benefit to

1. Rule 19 of the Tax Court's Rules of Practice, 26 U.S.C.A. (I.R.C.1954) § 7453, provides as follows:
"(e) No motion for rehearing, further hearing, or reconsideration may be filed more than 30 days after the opinion has been served, except by special leave."

petitioner for legal grounds stated by the court.

We shall discuss the three principal questions in the order in which they were enumerated above.

### 1. The Statute of Limitations Amendment.

■ In denying petitioner's motion that he be permitted to amend his petition to set up the bar of the statute of limitations as to the 1943 return, petitioner stated that since filed waivers were found for the last four years, it had been assumed that waivers were on file for 1943 as well; whereas, on careful examination, it was developed that no Form 872 had been filed for the year 1943. This motion was clearly filed out of time and need not have been permitted by the Tax Court.[1] Nevertheless, the court said as to this particular motion:

"However, the Court has full power to waive the time limit provided in such rule and, on its own motion, has done so in this case."

Thereupon the court permitted the filing of briefs on this point and upon consideration of the motion it denied permission to reopen the case, stating that the case had in all respects been terminated, and concluding:

"It is not believed that the Court should now reopen the case and allow the petitioner to amend his pleadings so as to raise a new issue, to wit, the defense of the statute of limitations as to 1943, and then make further findings of fact pertaining to that issue, and the rule upon it."

■ Even though the issue thus raised would have been a simple one to determine in the light of the allegations in the proposed amendment,[2] nevertheless if

2. The court could have assured itself that no contested issue would be presented to it by granting the motion on condition that the Commissioner's answer did not controvert the facts as asserted in the petition, since one of the allegations of the petition stated that the government would not controvert the issue.

the court had stopped there, it might be inappropriate for us to interfere with the Tax Court's exercise of its discretion in refusing to allow the filing of the amendment out of time. It seems so clear to us, however, that the real basis for the denial to petitioner of his request that he be permitted to plead the statute of limitations was the Tax Court's conclusion that the defense would be of no benefit to petitioner, that we feel it appropriate to review the basis assigned by the Tax Court to support such a view. Concluding that the reason thus assigned by the court to its refusal to permit the amendment is not warranted under the law, we are convinced that the Tax Court committed prejudicial error in not permitting the petitioner to file the amendment at least conditioned upon the respondent's admitting the truth of the allegations contained in the proposed amendment.

The basis of the court's holding that the statute would not avail petitioner anything is that the statute of limitations did not commence to run upon the filing of the "return" for 1943, because, so goes the reasoning, this was not such a "return" as was required to be filed by the taxpayer. This is one of the returns filed in the name of the taxpayer but signed, at his request, by his wife. Neither the Tax Court nor counsel for respondent cites any authority for the proposition that a return so signed is completely void and ineffectual to commence the running of the statute. The Internal Revenue Code itself is silent on the matter. The relevant sections of the 1939 Code are contained in the margin.[3] From a consideration of these provisions of the statute several things are clear. Unless a return was filed, the amount of income taxes could be assessed at any time. If a return was filed, the assessment must be made within three years of the date of filing. There was no definition of a return. Nor was there any specific authorization in the statute for the Commissioner to specify by regulations what constitutes a return. The only authorization as to regulations relates to what the return shall contain.[4]

It would be a harsh rule that would deny to a taxpayer the right to plead the statute of limitations otherwise available to him unless there was such a complete failure to comply with the statute that the Government's interests were in some way jeopardized. It is, of course, within the competence of Congress to make this requirement as rigid as it may see fit, but in the absence of any indication of an intent by Congress to make of the word "return" a word of art, the court should not do so.

Neither the Tax Court nor respondent's counsel in his brief has cited any authority for the proposition that an incorrect signing of the tax return by an individual subsequent to the date when an individual oath was required[5] prevents such return from being a return

---

3. Excerpts from the Internal Revenue Code of 1939, 26 U.S.C.A.:

§ 51(a) "*Requirement*. Every individual * * * shall make a return, which shall contain or be verified by a written declaration that it is made under the penalties of perjury. Such return shall set forth in such cases, and to such extent, and in such detail, as the Commissioner with the approval of the Secretary may by regulations prescribe, the items of gross income and the deductions and credits allowed under this chapter and such other information for the purpose of carrying out the provisions of this chapter as may be prescribed by such regulations."

§ 275(a) "*General rule*. The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed * * *."

§ 276(a) "*False return or no return*. In the case of a * * * failure to file a return the tax may be assessed * * * at any time."

4. § 6061 of the Code of 1954, 26 U.S.C.A. § 6061, specifically authorizes regulations as to the manner of signing.

5. The requirement that "individuals shall each make under oath a return stating" was eliminated by Section 136 of the Revenue Act of 1942, 26 U.S.C.A. Int. Rev.Acts.

for all purposes. The Tax Court relied on Plunkett v. C. I. R., 1 Cir., 118 F.2d 644, 649. The Commissioner's brief cited no cases in support of this proposition. We have made a careful search of the authorities and find none in point.

The Plunkett case is no authority, because the taxpayer there merely filed a form of return with no signature affixed and with no oath subscribed at a time when the statute specifically required that "individuals shall each make under oath a return * * *." As has been previously pointed out, there is no longer such requirement as this in the statute. The court held there that an unsigned and unverified return was not "the 'return required'" by the applicable section of the statute. This hardly supports the finding of the Tax Court here that the return signed in the taxpayer's name by his wife at his specific request, in the presence of, and at the place designated by, the accountant who prepared it, and who also signed it, was in effect "no return at all."

The only other cases that we have found bearing on this matter relate to corporate returns or were identical with Plunkett, supra.

Lucas v. Pilliod Lumber Company, 281 U.S. 245, 50 S.Ct. 297, 74 L.Ed. 829, was decided in light of a statute which specifically required that a corporation return must be sworn to by certain specified officers.[6] The return in question was filed in the name of the corporate taxpayer but it was unsigned and not sworn to by anyone. The Supreme Court held that it did not commence the running of the statute of limitations because it did not comply with the condition laid down by the statute which was that there must be filed a return duly sworn to. Subsequent Tax Court and Court of Appeals decisions

have followed the principle of the Pilliod Lumber Company case,[7] adding only the following explanation: The purpose of the oath requirement is to fix responsibility on the two designated corporate officers.

These cases may be distinguished from any that could arise under the revised Section 51(a) of the 1939 Code, supra, on the following grounds:

a. For corporations there is a specific oath requirement in the statute—and the Supreme Court relies on that for the rationale of its decision in the Pilliod case.

b. The oath requirement fulfills a particular purpose—it fixes responsibility on a particular corporate officer; this is not necessary in case of an individual return.

c. In all the cases cited above there was no colorable compliance; in each case there was a clear failure to take the required oath (and frequently even to sign the return).

The only case of an individual's return other than the Plunkett case in which there has been a holding that a return is not adequate to start the running of the statute is Richards v. C. I. R., 15 B.T.A. 800, in which the facts are identical with Plunkett. The return was not signed and was unverified, although the statute then required a return under oath. The Board relied on two of the corporate cases for its decision.

■ Fully recognizing, as we do, the necessity for regulations to make explicit many of the general provisions of the taxing statutes, the courts nevertheless cannot give effect to regulations that modify or limit to the detriment of the taxpayer the express terms of the statute itself.

---

6. *Requirement.* "Every corporation * * shall make a return * * *. The return shall be sworn to by the president, vice-president, or other principal officer and by the treasurer or assistant treasurer."

   The Revenue Act of 1918, c. 18, 40 Stat. 1057, 1081.

7. See Equity Union Creamery & Mercantile Exchange v. C. I. R., 9 B.T.A. 413; Watson v. C. I. R., 25 B.T.A. 971; Employees Industrial Loan Association v. C. I. R., 27 B.T.A. 945; Uhl Estate Co. v. C. I. R., 9 Cir., 116 F.2d 403; Burford Oil Co. v. C. I. R., 5 Cir., 153 F.2d 745.

Here the statute requires that "every individual * * * shall make a return which, shall contain or be verified by a written declaration that it is made under the penalties of perjury * * *." The Tax Court stresses that the signature of one *who had no power of attorney* was no signature at all, obviously basing its holding solely on Treasury Regulations 111, § 29.51–2(a).[8]

The Treasury's recognition, through the issuing of this regulation, that in certain circumstances chosen by it someone other than a taxpayer himself can sign his return and make it "the return required" by the statute, cannot have the effect of cutting down or limiting what may be a return as defined in the law itself. Such a regulation cannot be construed by the courts as making a return that does not comply with its terms "no return at all." The statutory grant of power to the Treasury to issue regulations does not touch upon the matter of the execution or making of the return, but covers only the extent and detail in which the items of gross income and the deductions and credits and "such other information for the purpose of carrying out the provisions of this chapter" are to be stated.

■■ Where, as here, a return complete in form, signed in the taxpayer's name by one purporting to have authority and who actually had such authority, was filed, we find no basis for holding that this was no such return as would commence the running of the statute of limitations. The Tax Court, therefore, erred in its conclusion that it would have availed the taxpayer nothing to have permitted the amendment setting up the statute of limitations for the year 1943. That court should, therefore, modify its judgment to provide that the proceedings will be reopened to permit the filing of the amendment and requiring a response thereto by the respondent. It may, however, provide further, in the discretion of the Tax Court, that unless the truth of the allegation in the amendment that the year 1943 is barred by the statute is established by respondent's answer without a further hearing on a factual issue, the record can be closed without further consideration of this plea. This condition seems appropriate in view of the discretion that is reposed in the Tax Court as to whether it should reopen proceedings after the normal conclusion of the case.

## 2. Negligence Penalty.

What we have said with respect to the sufficiency of the returns to start the running of the statute of limitations necessarily concludes the negligence issue in favor of the taxpayer. If, as we have

---

8. "The return may be made by an agent if, by reason of illness, the person liable for the making of the return is unable to make it. The return may also be made by an agent if the taxpayer is unable to make the return by reason of continuous absence from the United States for a period of at least 60 days prior to the date prescribed by law for making the return. Whenever a return is made by an agent it must be accompanied by the prescribed power of attorney, Form 935, except that an agent holding a valid and subsisting general power of attorney authorizing him to represent his principal in making, executing, and filing the income return, may submit a certified copy thereof in lieu of the authorization on Form 935. The taxpayer and his agent, if any, are responsible for the return as made and incur liability for the penalties provided for erroneous, false, or fraudulent returns. * * *"

9. "§ 291. *Failure to file return*
"(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *"

held, the returns were "the returns required" under the statute, then there was no failure under Section 291 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 291,[9] to make and file a return at the time required by the statute.

The Tax Court's decision on this point was based on the assumption that no return, within the contemplation of the statute, was filed by the taxpayer until the amended returns were filed in 1949. Even if this were so, the fact that the taxpayer and his wife, who signed his name to the returns, acted in accordance with the instructions of a certified public accountant who prepared and signed the returns himself, seems indisputably to prove that such failure (to file on time) was "due to reasonable cause and not due to willful neglect," and that a holding to the contrary with no countervailing evidence before the Tax Court could not be supported. We, therefore, hold that the negligence penalties imposed by the Commissioner should not have been sustained by the Tax Court.

### 3. Determination of Income.

The Internal Revenue Code gives the Commissioner of Internal Revenue the undeniable right, in the event the method of accounting employed by the taxpayer does not clearly reflect the income, to make the computation in accordance with such method as in his opinion does clearly reflect the income.[10] Here the taxpayer kept no permanent set of books of account. He did consider that his bank statements, vouchers and cancelled checks, with appropriate stubs, adequately reflected the income from his business. However, prior to the investigation of the tax years 1943 through 1946 was commenced, all of his retained records had

been destroyed in a manner that we may assume was entirely innocent.

It, therefore, became incumbent on the respondent to reconstruct the taxpayer's income to the best of his ability. The taxpayer complains that the agent should have followed the increase in net worth method of computation. It seems a sufficient answer to this contention to point out that the court, as fact finder, did not accept his assertion that he had $25,000 in cash at the beginning of the period in question. It is also of some significance that the first computation submitted to the agent failed (innocently we may assume) to include a bank account of $5,000 which was subsequently called to the attention of the respondent. There can be no requirement that the Commissioner use for his calculation of income a method which depends absolutely for its accuracy on the taxpayer's voluntary disclosure of his assets at the end of the period in a case where the court rejected his contention that he had a large amount of cash at the beginning of the period and when he overlooked a bank account of $5,000 at the end of the period.

It is clear, however, that the respondent made a poor try at reconstructing petitioner's income, and it was open to petitioner to point out areas or specific instances in which the method used by him failed truly to reflect his true income. This he did. He showed that the agent based his calculations on the incorrect assumption that the bank deposits represented the profit from the business. He demonstrated, by introducing evidence on specific items and of general testimony, that he spent thousands of dollars out of the bank account for supplies and other deductible expenses.

---

10. "*General rule.* The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so

employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *"

26 U.S.C.A.Internal Revenue Code of 1939, § 41.

The Tax Court had no evidence before it, either documentary or oral, as to even the round figures representing the disbursements from the bank account for deductible items for the years through 1946. For the year 1947 it had the cancelled checks. For some of the prior years it had some few invoices totalling substantial amounts. The unallowed disbursements for 1947 amounted to $8,228.76. The court found that "the payments made by check for business expenses and purchase of goods of the Marietta Buffet in 1947 provide a pattern which is identical to the expenditures by check in the years 1943 through 1947."[11] The court then, without spelling out the formula, applied some formula to the figure for the prior years and found net income for each of those years substantially lower than asserted by respondent.[12]

In no case did the actual invoices proven by the taxpayer even approximate the figure allowed him by the Tax Court for any particular year. The court did the best it could under the circumstances, and we cannot arrive at any different figures.[13] On this phase of the decision, therefore, the Tax Court's computation must stand.

The decision of the Tax Court is affirmed as to the deficiencies found for the years in issue, but the case is reversed and remanded to the Tax Court with directions that it eliminate the negligence penalty for the years 1943, 1945 and 1947, and for action on the tendered amendment touching the plea of the statute of limitations as to the year 1943, as herein indicated.

---

11. Petitioner asserts there was no pattern—that a much smaller percentage of total purchases was made by check in 1947 than during the earlier years; however, testimony of Mrs. Miller supports this conclusion of the Tax Court.

| Year | Commissioner | Tax Court |
|------|-------------|-----------|
| 1943 | $17,094.08 | $13,172.42 |
| 1944 | 36,264.15 | 26,972.97 |
| 1945 | 37,009.08 | 25,936.47 |
| 1946 | 42,347.35 | 27,958.09 |
| 1947 | 13,008.20 | 13,508.20 |

13. The Tax Court said: "In giving effect, in the years 1943, 1944, 1945, and 1946, in arriving at petitioner's net income for those years, to allowances for payments made by check in the payment of expenses and the purchase of goods, as the Commissioner did for 1947, we have made the best approximation we could under all the evidence, no complete invoices and canceled checks being available for those years."