Alvin Wechsler, et al. [1] v. Commissioner. Wechsler v. Commissioner
Docket Nos. 79860-79863, 79865, 79866.
United States Tax Court
T.C. Memo 1961-345; 1961 Tax Ct. Memo LEXIS 4; 20 T.C.M. (CCH) 1801; T.C.M. (RIA) 61345; December 27, 1961
*4 Bernard, his son Alvin, and his daughter Ruth were partners during the years 1943-1945 under written partnership agreements in Paramount Hollywood Fashions, engaged in the business of manufacturing and wholesaling ladies' ready-to-wear sports clothing. In order to obtain goods for Paramount to make clothes, Bernard found it necessary to make cash payments to "finders." To avoid recording such payments on the books of Paramount, he devised a plan of having the bookkeeper deliver directly to him checks received in payment of "special" sales invoices. Neither these sales nor the cash payments to "finders" were recorded on the books of Paramount nor included in the computation of Paramount's net income. Held: 1. Respondent failed to prove fraud against Bernard. Assessment and collection of deficiency against Bernard for 1944 barred by statute of limitations. 2. 1944 returns of Bernard, Mae, and Ruth, signed in their names and timely filed by Alvin, pursuant to authority, during their absence from Los Angeles, were valid returns. Bernard and Mae are not liable for addition to tax under section 291(a), I.R.C. 1939. Assessment and collection of deficiency against Ruth for 1944 barred by *5 statute of limitations. 3. Paramount realized additional income in the form of unreported sales in the amounts of $40,190.06 and $19,574.29 for its fiscal years ended June 30, 1944 and 1945, respectively. 4. Paramount was not entitled to deduct any amount for cash payments made to "finders" as cost of goods sold or otherwise. 5. Additional income realized by Paramount from unreported sales was distributable to partners in accord with written partnership agreements, not all to Bernard. Walter L. Nossaman, Esq., Statler Center, Los Angeles, Calif., and Thomas L. Caps, Esq., for the petitioners. J. Earl Gardner, Esq., and Charles F. Quinlan, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings respondent determined deficiencies in income tax and additions to tax against petitioners for the taxable years and in the amounts as follows: Additions to tax,
Docket
I.R.C. 1939
No.
Petitioner
Year
Deficiency
Sec. 293(b)
Sec. 291(a)
79860
Alvin Wechsler
1944
$ 5,775.16
1945
4,280.14
1946
397.17
1947
1,755.48
79861
Bernard A. Wechsler
1944
14,798.63
$7,399.32
$3,699.66
1945
9,504.32
4,752.16
79865
1946
525.53
1947
155.08
79862
Ruth Joseph (formerly Ruth
Wechsler)
1944
$ 4,074.66
1945
5,191.95
1946
400.17
1947
119.17
79863
Mae Wechsler
1944
14,907.24
$7,453.62
$3,726.81
1945
9,504.32
4,752.16
79866
1946
525.53
1947
155.06
*6 The parties have disposed of all but the following issues by stipulation. The issues left for decision concern only the taxable years 1944 and 1945, except for an issue raised by amendment to the petitions concerning the year 1946, which will be decided in accordance with our opinion on the same issue for the years 1944 and 1945. The issues remaining for decision are: 1. Whether the net income of a partnership, Paramount Hollywood Fashions (and through it, the income of some or all of the petitioners), was understated for its fiscal years ended June 30, 1944 and 1945. Petitioners admit that sales in the amount of $39,798.37 [2] for.1944 and $19,574.29 for 1945 were not reported, but claim offsetting unreported cost of goods sold for those years in the form of cash payments made to socalled "finders" in order to obtain goods for manufacture and sale. 2. If net income of the partnership was understated, whether all the omitted income should be charged to Bernard Wechsler *7 or to each of the partners in accordance with the written partnership agreements. 3. Whether any part of the deficiency, if any, of Bernard Wechsler for the years 1944 and 1945 was due to fraud with intent to evade tax. (Respondent concedes the fraud issue with respect to Mae Wechsler on brief.) 4. Whether assessment and collection of a deficiency against Bernard Wechsler for the year 1945 is barred by the statute of limitations under section 275(a) of the 1939 Code. [3]
5. Whether Bernard Wechsler and Mae Wechsler are each liable for the addition to tax under section 291(a) for the year 1944 for failure to file timely returns for that year. 6. Whether assessment and collection of a deficiency against Ruth Wechsler Joseph for the year 1944 is barred by the statute of limitations. [4]
Findings of Fact Some of the facts have been stipulated and are found as stipulated. Bernard A. Wechsler (referred to herein as Bernard) and Mae Wechsler *8 (referred to herein as Mae) were at all times here involved husband and wife residing in Los Angeles, California. They each filed separate income tax returns for each of the years 1944-1947 with the collector of internal revenue, Los Angeles, California. All of their income was community income under the community property laws of California for each of those years. Alvin Wechsler (referred to herein as Alvin) is the son of Bernard and Mae, and resides in Los Angeles, California. He filed individual income tax returns for each of the years 1944-1947 with the collector of internal revenue, Los Angeles, California. Ruth Wechsler Joseph (referred to herein as Ruth) is the daughter of Bernard and Mae, and resides in Los Angeles, California. She married Ben Joseph on January 6, 1945, and remained married to him throughout the years here involved. All income earned by Ruth and Ben Joseph subsequent to their marriage was community income under the community property laws of California. Ruth filed separate income tax returns for each of the years 1944-1947 with the collector of internal revenue, Los Angeles, California. The income tax returns of all the petitioners for all the years here involved *9 were filed on a cash and calendar year basis. The income tax returns of Bernard, Mae, and Ruth for the year 1944 were each prepared by an accountant and signed in their respective names by Alvin who, in each case, signed the taxpayer's name and inserted his initials preceded by the word "per" following the taxpayer's signature. Each of those returns was filed on or before March 15, 1945, and the tax liability shown thereon was paid on the same date. Bernard, Mae, and Ruth were all some distance away from Los Angeles when these returns were prepared and filed, Bernard having been in New York, Ruth in Minnesota, and Mae at Murrieta Hot Springs, about 75 miles from Los Angeles. Alvin had a written general power of attorney from Bernard which was in effect at the time he signed Bernard's return, and he had express oral authority from both Mae and Ruth to sign their 1944 returns for them. Bernard, Mae, and Ruth, each ratified Alvin's actions in signing and filing their 1944 returns for them on the witness stand in the trial of this case. During all times material hereto Bernard, Alvin, and Ruth were partners in a bona fide partnership doing business as Paramount Hollywood Fashions (referred *10 to herein as Paramount), engaged primarily in the business of manufacturing and wholesaling ladies' ready-to-wear sports clothing in Los Angeles, California. Mae was not a partner in the business, took no part in its activities, and had no knowledge of its affairs. Partnership returns of income were filed by Paramount on an accrual basis for each of its fiscal years ended June 30, 1944 and 1945, with the collector of internal revenue, Los Angeles, California. The following receipts, income, and deductions were reported by Paramount for the taxable years ended June 30, 1944 and 1945: Taxable year
ended June 30 -
1944
1945
Net sales [1]
$624,762.10
$602,173.76
Cost of goods sold
473,820.54
441,334.50
Gross profit
150,941.56
160,839.26
Operating expenses [2]
42,184.20
54,065.14
Net profit
$108,757.36
$106,774.12
Miscellaneous income
717.98
107.43
Net income
109,475.34
106,881.55 [3] Bernard was engaged in the garment business from about 1916 until 1931 in New York City. In 1931 he moved to California. His health was bad at that time and *11 he could not conduct his garment business. Later he went back into the business. In 1942 he operated Paramount as a sole proprietorship in Los Angeles. Paramount did not manufacture clothing itself. It purchased all the raw materials, cloth, bindings, and trimmings necessary to make ladies' ready-to-wear sports clothing, styled it, and then had the articles sewn and manufactured by contractors who delivered the completed garments to Paramount for sale to stores. Bernard, Ruth, and Alvin operated Paramount under a written partnership agreement dated July 1, 1943, by the provisions of which agreement Bernard was entitled to 63 percent of the net profits of the partnership, Alvin was entitled to 27 percent, and Ruth was entitled to 10 percent. By the terms of a new written partnership agreement dated January 1, 1945, Bernard was entitled to 40 percent of the net profits of Paramount, Ruth was entitled to 40 percent, and Alvin to 20 percent. Bernard was the prime mover in the business and did most of the buying and selling. Ruth took care of the designing and advertising, the OPA records, and other Government regulation forms. Alvin, who was in the Army from September 1943 until November *12 1944, had general supervisory duties. In August 1943 Lottie Elman (referred to herein as Lottie) was employed by Paramount as bookkeeper after being interviewed for the job by Alvin. Before beginning work as Paramount's only bookkeeper, Lottie had worked for other firms as an assistant bookkeeper, working on accounts payable and receivable, for about 7 or 8 years. Her job with Paramount was the first time she had worked without the guidance of a chief bookkeeper and the first time she had performed all the duties of a bookkeeper. For the period under review she maintained all the books and records of Paramount without receiving any assistance or direction from the partners or from the other employees. One of her duties was to prepare a trial balance at the end of each month but she did not make the adjusting entries. Such entries were made by a certified public accountant, Irving Kellogg (referred to herein as Kellogg), who prepared financial statements and income tax returns for Paramount, as well as the income tax returns for the petitioners, for the years here involved. Among other things, Lottie handled the accounting for purchases for Paramount. She maintained a purchase journal *13 in which were recorded the vendor's name, date of invoice, invoice number, and amount of invoice. She also kept a file, an incoming-piece goods folder, to keep a record of all merchandise that was billed and due for delivery to Paramount. Incoming goods were first received by a shipping clerk who came to Lottie's desk and got the invoice for the shipment, checked the goods, and gave them a piece goods number which was reported to Lottie when the invoice for the incoming shipment was returned to her. If there was no invoice when the goods arrived, the packing slip was used by the clerk. This slip would later be attached to the invoice. When goods were thus accounted for, Lottie recorded the shipment received in the purchases journal. At the end of the month she posted the total for the month to purchases and to accounts payable in the general ledger. The totals posted to the purchases account in the general ledger were the amounts claimed as purchases on the partnership information returns for each of its fiscal years 1944 and 1945. Lottie wrote the checks in payment of the accounts payable. The checks were signed by Bernard. It was Lottie's responsibility to mail the checks to the *14 payees; she usually mailed them personally, but sometimes she gave them to the stenographer to mail. Lottie obtained the payees' addresses from invoices. Lottie also reconciled the partnership bank account at the end of each month. As part of this task, she would compare the endorsements on the backs of checks with the payees' names. As a part of her duties as bookkeeper, Lottie also recorded the partnership sales. Customarily, sales invoices were made out by shipping clerks when the merchandise was shipped. The sales invoices were serially prenumbered in pads or books of 50 invoices each, there being an original and three or four duplicates of each invoice. When Lottie received the duplicate invoices, still in the pads, she credited the amount thereof to sales and debited the customers' accounts receivable. When checks were received from customers in payment of the accounts or invoices, Lottie debited cash and credited the customers' accounts receivable. The checks received were normally deposited in the partnership bank account by Lottie. Periodically, Lottie sent statements to customers who appeared from the accounts receivable records to be overdue in their accounts. Because of *15 shortages occasioned by World War II, Paramount had difficulty obtaining goods from 1943 to mid-1945. The War Production Board established priorities for the purchase of goods which were based upon the use to which the purchaser was to put the goods. Paramount produced no clothing for the armed services or for export and it had the lowest priority. Having such a priority did not assure that Paramount would be sold goods. It merely permitted Paramount to buy goods if a supplier could be found; and it permitted a supplier to sell goods to Paramount if he was willing to do so. Bernard, who purchased goods for Paramount, made buying trips to New York City where he encountered the shortage of goods. He tried to purchase goods but was told by suppliers that Paramount was not a regular customer and that the suppliers could not even fill orders for customers of long standing. Paramount had no "position" with the suppliers, that is, it had not been in business long enough to have become a regular purchaser and it was too small to be considered an important potential customer by the suppliers. Bernard tried to make connections with persons who he felt had influence in the garment industry and *16 who might be able to have goods sold to Paramount. He found that by making cash payments to certain persons, called "contacts" or "finders," the converters (the suppliers of goods to a manufacturer such as Paramount) that formerly refused to sell him goods were willing to sell to Paramount after he had made connection with these persons. These "finders" were strangers to Bernard. They made appointments for him to see converters, and they told him where, when, and with whom the appointment was to be. When Bernard went to the converter and kept the appointment, he would be given a contract for the purchase of goods, to be delivered - always at OPA ceiling prices - to Paramount in Los Angeles. After the meeting, the "finder," who knew that Bernard had made the purchase, would sometimes telephone Bernard and tell him where to meet with the "finder" to make a payment in cash. On other occasions, the meeting with the "finder" would be arranged at the time Bernard was told of the appointment. Paramount was billed by the supplier for the OPA ceiling price. Paramount paid these invoices directly to the supplier by check. This was the only amount recorded in purchases by Lottie and this was *17 the only amount ever paid by Paramount directly to the suppliers for goods. Bernard began the practice of paying these "finders" in early 1943. At first he used some of his own funds to make the cash payments to the "finders." Bernard kept cash in a safety deposit box which he had maintained at the Merritt Building at Eighth and Broadway in Los Angeles since 1936. When Bernard exhausted his personal funds he began getting amounts of cash from Paramount to pay the "finders." He did not want these cash payments to appear on the books of Paramount, and no cash purchases were recorded on Paramount's books or included in its cost of goods sold on its tax returns. Bernard devised the following plan to get cash from Paramount to make these payments to "finders." Bernard chose certain orders from customers of Paramount which he had on hand, which orders were to be shipped on certain delivery dates. He gave invoice books, which were not in numerical sequence with the books then being used by the clerks, to the shipping clerks and instructed them to use the invoices from these "special" books for the orders which he had chosen. Anyone of several shipping clerks would prepare an invoice for a *18 shipment. When a shipping clerk was through with an invoice book, he would give it to Lottie. Invoice books, including the "special" books which Bernard instructed were to be used with certain orders, were kept at Lottie's desk with other records. These "special" books were not available at the time of trial. The first time one of the "special"books was delivered to Lottie, the shipping clerk told her to see Bernard about those invoices. Lottie was told by Bernard to give him the checks received in payment of the "special" invoices. Lottie assumed that because Bernard was receiving such checks he would either record them on the books of Paramount or tell the accountant, Kellogg, about them. Consequently, she did not record these "special" invoices in sales nor did she debit them to the customers' accounts receivable. When she received checks in payment of these "special" invoices, which usually carried the invoice number, she simply turned the checks over to Bernard and did not include the amounts thereof in cash receipts. Occasionally such a check would be deposited in the partnership bank account by mistake, and then a partnership check would be drawn payable to Bernard in the amount *19 of the "special" invoice. Also on occasions the customer's check would be in payment of some regular invoices as well as "special" invoices and if the entire check was turned over to Bernard, he would draw a check on his personal bank account payable to Paramount in the amount of the regular invoice. At first Bernard deposited these checks in his personal bank account. He deposited a total of $16,871.26 of these checks in his bank account and returned a total of $4,172.04 to Paramount, leaving a balance of $12,699.22 of these funds available for his personal use. Later Bernard began cashing the customers' checks and depositing the proceeds in his safety deposit box or in a safe at the office until he needed it. During the years specified, the following sales total, by customer, were omitted from the records and information returns of the partnership, and were not reported in the income tax returns of any of the partners: Taxable Year
Ended June 30 -
1944
1945
Butler Brothers
$17,398.51
$ 6,241.74
Darling Stores Corp.
8,131.89
3,381.84
Grayson Shops, Inc.
6,559.95
1,849.60
Miller-Wohl Co., Inc.
3,901.32
Beard and Gabelman
4,198.39
Spiegel, Inc.
8,101.11
Total
$40,190.06
$19,574.29 Bernard's practice of *20 paying cash to "finders" ceased about the middle of the year 1945 when goods became more plentiful and Paramount had also established a "position" with suppliers. Bernard also stopped diverting customers' checks at about the same time. Bernard kept no record of the amounts of cash he paid to "finders" or the persons to whom he made such payments. Bernard does not know whether any of the cash payments ever reached the actual supplier of the goods. No cash payments were made directly to the suppliers. None of the cash payments were deducted by Paramount in arriving at cost of goods sold or net income in its partnership information returns and no tax benefit in the form of reduced net income or otherwise was received by any of the petitioners as a result of these cash payments. Two routine examinations of the returns of Paramount and of the petitioners for the years here involved were conducted by agents of respondent, but a former shipping clerk employed by Paramount took some 40 invoices or express receipts for unreported sales to respondent's representatives and, as the result of information obtained from this former clerk, a special agent and a revenue agent were assigned the returns *21 involved herein for examination. This last examination, which took place during 1948 and 1949, resulted in the determination of the deficiencies with which these proceedings are concerned. No errors or irregularities in the books of Paramount or in the income reported by Paramount on its partnership information returns were discovered by respondent's agents, except for the unreported sales mentioned above. During the course of respondent's examination, Bernard, with the assistance of his attorney and accountant, prepared a net worth and personal expenditures statement covering the period January 1, 1943, to December 31, 1947, which was submitted to respondent's agents. It was based for the most part on records then available, except for an item in the opening net worth of cash on hand in Bernard's safety deposit box of $15,000. The increase in net worth and personal expenditures, as reflected on that statement, can be accounted for by income reported by Bernard and Mae on their tax returns filed for the years 1943-1947. In June 1952 Bernard was tried for criminal tax evasion with respect to his 1945 Federal income tax return. No verdict was reached by the jury at that trial. In May *22 1955, upon retrial, Bernard was acquitted by a jury of this charge. Ultimate Findings No part of any deficiency which may be due from Bernard for the years 1944 and 1945 is due to fraud with intent to evade tax. Bernard's returns for the years 1944 and 1945 were not false or fraudulent with intent to evade tax. Assessment and collection of any deficiency against Bernard for the year 1945 is barred by the statute of limitations. The income tax returns filed for Bernard, Mae, and Ruth for the year 1944 were valid and were timely filed. Assessment and collection of any deficiency against Ruth for the year 1944 is barred by the statute of limitations. Bernard and Mae are not liable for the addition to tax under section 291(a) for the year 1944 for failure to file timely returns for that year. Paramount realized additional income in the form of unreported sales in the amount of $40,190.06 for its fiscal year ended June 30, 1944, and in the amount of $19,574.29 for its fiscal year ended June 30, 1945. Petitioners have failed to carry their burden of proving that Paramount was entitled to deduct as cost of goods sold or as any other form of allowable deduction in any of the years here involved *23 any amounts for cash payments to "contacts" or "finders." The additional income realized by Paramount from unreported sales for its fiscal years 1944 and 1945 was distributable to the partners in accordance with the written partnership agreements effective at the time. Opinion We will consider first the fraud issue. The burden is on respondent to prove fraud by clear and convincing evidence. An essential element of fraud for purposes of both sections 293(b) and 276(a) is the intent to defraud the Government by calculated tax evasion. Welburn Mayock, 32 T.C. 966 (1959); E. S. Iley, 19 T.C. 631 (1952). Respondent appears to rely on the admitted understatement of approximately $60,000 in sales in the 2-year period and the claim that these sales were deliberately kept off the books and returns of Paramount by Bernard as sufficient to carry his burden of proof, and then examines Bernard's defense to determine whether it negates a finding of fraud. This is not our understanding of the burden respondent must carry. While the omission of large amounts of income may be an indicia of fraud to be weighed along with the other evidence, it in itself does not prove fraud. L. Glenn Switzer, 20 T.C. 759 (1953). *24 All of the evidence, considered together, must prove clearly and convincingly not only that income was omitted but also that it was deliberately omitted for the willful purpose of evading tax. James Nicholson, 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). In addition to the stipulated evidence that the receipts covering 207 invoices and approximately $60,000 in receipts were not recorded on the partnership books, respondent attempted to show that these unreported invoices and sales were only about one-fifth of the actual invoices and sales that were unreported, that Bernard directed Lottie not to record these sales, that Bernard did not use these diverted funds for payment of "finders' fees" or for any other partnership purpose but used them for his own purposes, and that all of this was done in a calculated scheme to evade taxes. The only trouble is that there is little, if any, reliable evidence to support these contentions - they can be argued for the most part by inference only. The argument that only about one-fifth of the unreported sales were discovered is based on the testimony of Lottie that the "special" invoices always came to her in completed books of 50. *25 Respondent then points to a number of out-of-sequence invoices referred to in the records of some of Paramount's suppliers and not recorded on Paramount's books, and assumes that the remaining 49 invoices in that series of 50 were also unreported but undiscovered. This hardly seems logical in view of the fact that one of Paramount's shipping clerks was an informer in this case and took about 40 invoices or express receipts with him when he contacted respondent's agents in 1947 or 1948. If he knew of Bernard's plan, which he presumably did, it is likely he could have supplied the names of most of the suppliers whose receipts were being diverted, and a comparison of the suppliers' records with those of Paramount back at that time when the records were still available should have disclosed the additional unreported sales, if such there were. For some reason unexplained in this record, respondent did not offer the testimony of the informer or any of Paramount's other shipping clerks who might have supported this argument. Respondent on brief also seems to claim, with no explanation why, that the receipts from these undiscovered omitted sales were deposited in the partnership bank account, *26 although not recorded in sales or accounts receivable, and then partnership checks were drawn to Bernard for the amounts thereof. Such a procedure, with no charge to Bernard's drawing account, would certainly invite the suspicions not only of respondent's agents but of Paramount's accountant in trying to reconcile the partnership bank account. In addition, a diversion of approximately $300,000 over a 2-year period, which respondent seems to suggest, would certainly show up in Bernard's net worth and personal expenditures unless the cash was hidden somewhere, and there is no evidence of that. While it is true that respondent did not base his case on the net worth and personal expenditures method, his agents did check most of the beginning and ending items on the net worth statement prepared by Bernard, except the $15,000 cash on hand at the beginning of the period, and apparently could find nothing that would suggest that Bernard had appropriated to his own use even the $60,000 unreported sales, much less $300,000. Also, most all of Bernard's personal transactions can be traced through available records to their sources. Respondent's claim that Bernard directed Lottie to leave the "special" *27 sales off the books in a deliberate scheme to evade tax is based principally on a statement written by respondent's agents and signed by Lottie the first time they interviewed her. This statement was dated May 4, 1950, and was admitted in evidence to impeach Lottie's testimony in this trial. Lottie testified unequivocally on the witness stand that Bernard never instructed her to omit these sales from the books and records, that all he ever told her to do was to give him the checks, and that she did not record the sales on her own volition because she assumed that since Bernard got the checks he would take care of reporting the income directly with the accountant. Bernard testified that he did not know until respondent's investigation started that these sales had not been reported. Lottie's statement of May 4, 1950, which admittedly was written by respondent's agents, contained a statement that upon the instructions of her employer she withheld entering certain receipts on the regular books and records of account. Lottie testified that she told the agents to strike the words "upon the instructions of my employer," but they did not do so. In any event, at a second conference with the *28 agents 4 days later, where questions and answers were recorded by a stenographer, Lottie stated that Bernard had not given her instructions to withhold recording these receipts. While we find it somewhat difficult to believe that Bernard did not realize that these sales were not being recorded until 1948, we do not think there is convincing evidence that Bernard instructed Lottie to omit recording these sales in a deliberate scheme to evade tax. There is no positive evidence to support respondent's claim that Bernard did not pay out the diverted funds to so-called "contacts" or "finders." Respondent relies on the testimony of officers of several of Paramount's suppliers that they did not receive any cash payments from Bernard and it was not the practice of their companies to accept over-the-ceiling cash payments, and also on the fact that Bernard could supply the names and addresses of very few people to whom he had made cash payments. However, Bernard admits that he did not make any cash payments directly to the suppliers, and claims that the persons to whom he made payments were numerous and for the most part previously unknown to him, and says he made no record of their names and *29 addresses. Bernard did make a trip to New York to try to get some of these people to testify for him in his criminal trial but he says they refused to do so. The evidence in this case indicates that a considerable black market existed in the garment industry during the war years, and that someone in Bernard's position would probably have had to pay commissions, legitimate or otherwise, to obtain cloth goods; and the record shows that Paramount was able to obtain goods from a number of new suppliers after Bernard's activities started. Bernard's story is that he found he would have to make cash payments in order to obtain goods and stay in business, that he needed a ready supply of cash for this purpose, that he did not want these payments recorded on Paramount's books because they would indicate OPA and other Government regulation violations, so he devised this scheme to get the necessary cash from Paramount, thinking that the income was being recorded but the expenditures were not. This is supported to some extent by the relatively high ratio of net return to sales experienced by Paramount during this period, and by the fact that there was apparently little effort, if any, to conceal *30 the "special" invoices. They were available to all of Paramount's employees and were kept with the regular invoice books. While there are some inconsistencies in Bernard's evidence, time alone may account for some of them. His story is not entirely incredible - and even if he did know the sales were not being reported, consistent with his position here he may have felt the cash payments were deductible anyway and would offset the unreported income, which would result in no underpayment of tax. While the question of fraud is close, we do not think the record taken as a whole provides the clear and convincing evidence required to prove fraud. It would uselessly prolong this opinion to discuss in more detail the evidence presented. Suffice it to say that we have considered it all and are not convinced. Fraud should not be imputed or presumed and the Court should not sustain findings of fraud upon circumstances which at most create only suspicion. Davis v. Commissioner, 184 F. 2d 86 (C.A. 10, 1950). Absent a finding of fraud or intent to evade tax, respondent agrees that the addition to tax under section 293(b) may not be imposed, and that assessment and collection of any deficiency *31 against Bernard for the year 1945 is barred by the statute of limitations. We next consider whether Paramount may include as additional cost of goods sold the cash payments claimed to have been made by Bernard to "contacts" or "finders" in order to obtain goods for Paramount. On this issue the burden of proof is clearly on petitioners. Paramount did not record these payments on its books and did not claim them on its information returns. And, it is our impression of Bernard's testimony that his principal reason for not reporting these payments was that he believed these payments violated OPA and other Government regulations and would get Paramount in trouble if they were reported. Petitioners are quick to point out that if payments are shown to be a cost of goods sold, public policy does not prevent the deduction of these amounts in determining gross income. They rely on Lela Sullenger, 11 T.C. 1076 (1948); Hofferbert v. Anderson Oldsmobile, 197 F. 2d 504 (C.A. 4, 1952); and Commissioner v. Weisman, 197 F. 2d 221 (C.A. 1, 1952), affirming a Memorandum Opinion of this Court, in support of their position on this issue. Respondent does not disagree with petitioners' basic premise, *32 nor do we. But it is still incumbent on petitioners here to prove not only that payments were made but also the amounts thereof and that they represented an actual cost of goods sold. The situation here in unlike that in the three cases cited above and relied on by petitioner, where the parties stipulated or it was found as a fact that definite amounts of overceiling payments were made directly to the supplier of goods for the goods sold in the taxpayer's business. Whether or not valid distinctions can be made as to the nondeductibility of section 23 deductions as compared to cost of goods sold on the ground of public policy, see cases cited above, we think the same burden rests on taxpayer in either case to prove the amount paid and that it was a payment that would reduce either gross income or net taxable income. Petitioners argue that Bernard paid out in cash an amount in excess of the unreported sales as "finders' fees." The only direct evidence to support this is Bernard's testimony that he used every cent of the diverted sales, plus $15,000 of his own cash taken from his safety deposit box, and less the net amount of diverted sales deposited in his personal checking account, *33 or a net total of over $61,000, to make these cash payments to "finders" or "contacts," and the vague testimony of one witness taken by deposition that Bernard paid him commissions for obtaining goods. On the other hand, Bernard could not remember the amount of any fees he paid, could mention only a few names of persons to whom he made the payments, only one of whom could actually be located, and did not state with any degree of certainty just when any particular payments were made. Unless we accept Bernard's self-serving testimony at face value there is no way we could even guess from the record how much Bernard may have paid out in "finders' fees" in any particular year. Bernard's absolute lack of any records or recollections of the persons to whom payments were made and the amounts thereof does not encourage us to accept his testimony at face value. It is hard to believe that he would have paid out over $60,000 in 2 years without making some record of the persons to whom the payments were made and the amounts thereof. The fact that the net worth statement prepared by Bernard would tend to show that he did not retain much of the diverted receipts would at best show only that he *34 spent them on something, we know not what. Furthermore, even if we accept Bernard's testimony that he spent some $61,000 for "finders' fees," we do not believe that petitioners have shown that such amounts represented purchases. They must prove at least the latter point to come within the ambit of the principle laid down in Sullenger and the other cases relied on by petitioners. In those cases the point appeared by agreement of the parties; here, it is not proved. At no point did Bernard testify that fees which he paid in cash went for the purchase price of goods. In fact, Bernard disclaimed any knowledge of what the payments may have been for. He says he paid the amounts to persons who represented to him that they had connections with suppliers; after he agreed to pay these persons, suppliers to whom he was directed began taking his orders. Bernard says he "assumed" that the "finders" had some connection with the suppliers. We have no information as to what that connection may have been. We have only the evidence from some of Bernard's suppliers that they did not sell at overceiling prices to Bernard. We have no evidence from any of them that they did. Perhaps the "finders" bribed *35 employees of legitimate firms to make shipments to Bernard; perhaps the "finders" were themselves employees of legitimate firms. But there is no evidence that the payments reached the sellers of the goods as part payment for the goods sold to Paramount. On the evidence presented, we cannot find that the "fees" were part of the purchase price of goods sold. If the payments are deductible on any other basis, petitioners have neither suggested nor argued it to us. Petitioners have not sustained their burden of proof on this issue. Paramount is not entitled to any increase in its cost of goods sold by reason of the purported cash "finders' fees" paid by Bernard, nor to deduct any part thereof from gross income in arriving at net income. Having found that the net income of the partnership was understated for its fiscal years 1944 and 1945 by the amounts of the unreported sales, being $40,190.06 and $19,574.29, respectively, we must next determine whether this additional income is to be attributed solely to Bernard (and one-half to Mae who derived her portion from Bernard as community income), or whether the additional partnership income is attributable to Bernard, Alvin, and Ruth in the *36 percentages provided in the written partnership agreement effective at the time. Respondent determined and contends that the entire amount is attributable to Bernard, but, to protect the revenue, also determined that Alvin's and Ruth's shares under the written partnership agreements were attributable to them. A partner's proportionate share is determined by the partnership agreement, but partners can arrange and change from time to time the partnership shares to which each will be entitled, and tax consequences will normally follow the agreement. Leff v. Commissioner, 235 F. 2d 439 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court. It is stipulated that the partnership between Bernard, Alvin, and Ruth was bona fide. The partnership agreement was evidenced by two written partnership agreements, one effective from July 1, 1943, to January 1, 1945, and the other effective from January 1, 1945, throughout the remainder of the period here involved. The latter was amended (with respect to provisions not material here) in writing on February 1, 1945, and on November 29, 1945. The first provided that partnership net profits should be divided 63 percent to Bernard, 27 percent to *37 Alvin, and 10 percent to Ruth. The second changed the division of net profits to 40 percent for Bernard, 40 percent for Ruth, and 20 percent for Alvin. There is no evidence that these were not binding agreements and the evidence shows that the partnership profits were distributed and the partners reported their share of the profits in accordance with these agreements. Unless it can be shown that the partners mutually changed these agreements, the net profits of the partnership were attributable to the partners in accordance with the terms of those agreements. Respondent contends that Bernard received the receipts from all the unreported sales, that the other partners acquiesced therein, and that this constituted a modification of the partnership agreements which would control the tax consequences. Respondent points to no evidence which would support his contention. Alvin testified that he knew of the practice of paying "finders' fees" and knew Bernard was using partnership funds for that purpose but condoned it because it benefited the partnership. Ruth testified that she did not know the sales were being diverted until just before this trial, however incredible such testimony might *38 be. There is no evidence that the partners ever agreed that Bernard could withdraw partnership funds at will for his own personal use. There is no evidence that Alvin and Ruth knowingly acquiesced in the withdrawal of partnership funds by Bernard for his own use. All the evidence points to the fact that if Alvin and Ruth knew Bernard was withdrawing partnership funds, they assumed he was using them for partnership purposes and they would all benefit thereby in accordance with their carefully drawn, written partnership agreements. [5]
We conclude that the additional partnership income was attributable to the partners in accordance with the written partnership agreements. The final issue is concerned with whether Bernard and Mae are liable for the penalty under section 291(a) for the negligent failure to file returns for the year 1944; and whether the return filed for Ruth for the year 1944 was sufficient to start the running of the statute of limitations. If Ruth's return was sufficient for the stated purpose, *39 assessment and collection of a deficiency against her for the year 1944 is barred. We have set forth in our findings the circumstances under which Alvin signed Bernard's, Ruth's, and Mae's names to returns for 1944. It seems Bernard was in New York, Ruth was in Minnesota, and Mae was some 75 miles from Los Angeles when the returns were completed by the accountant and were ready for their signatures. There is no evidence that there were filed with the returns either the prescribed forms of powers of attorney or certified copies of "valid and subsisting general [powers] of attorney" as required by section 29.51-2(a), Regs. 111, [6] *40 in those instances where a return is signed by an agent. Furthermore, neither Bernard, nor Ruth, nor Mae was unable to "make" his or her return because of illness or absence from the United States. But here Alvin purported to, and we have found that he in fact did, have authority to sign Bernard's, Ruth's, and Mae's names to the retturns for 1944 captioned in their respective names. Consequently, we have found that Bernard, Ruth, and Mae filed valid returns for 1944. In reaching this conclusion, we have followed the principle announced in Miller v. Commissioner, 237 F. 2d 830 (C.A. 5, 1956), reversing a Memorandum Opinion of this Court, as did this Court in Clyde M. Booher, 28 T.C. 817 (1957). Respondent cites no authority to the contrary. Inasmuch as the returns were admittedly timely filed, it follows that Bernard and Mae *41 are not liable for the section 291(a) penalty for 1944 and, further, that any deficiency due from Ruth for 1944 is barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith; Bernard A. Wechsler, Docket No. 79861; Ruth Joseph (formerly Ruth Wechsler), Docket No. 79862; Mae Wechsler, Docket No. 79863; Bernard A. Wechsler, Docket No. 79865; and Mae Wechsler, Docket No. 79866.↩
2. It is stipulated that the unreported sales for 1944 were $40,190.06. On brief petitioners claim that unreported sales are overstated by $391.69. Respondent disagrees. We have found the unreported sales to be as stipulated.↩
3. All section references are to the Internal Revenue Code of 1939 unless otherwise indicated.↩
4. Issues 5 and 6 above are dependent on whether returns for 1944, timely filed for each of Bernard, Mae, and Ruth, but signed for them by Alvin, were valid returns.↩
1. Gross sales less returns, allowances, and sales discounts. ↩
2. Excluding charitable donations disallowed as deductions to partnership. ↩
3. A short-term capital loss of $1,500 was reported.↩
5. We accept Bernard's testimony that the $12,699.22 receipts from omitted sales deposited in Bernard's personal bank account was to replace personal funds he had previously used.↩
6. Sec. 29.51-2. Form of Return. - (a) * * * The return may be made by an agent, if by reason of illness, the person liable for the making of the return is unable to make it. The return may also be made by an agent if the taxpayer is unable to make the return by reason of continuous absence from the United States for a period of at least 60 days prior to the date prescribed by law for making the return. Whenever a return is made by an agent it must be accompanied by the prescribed power of attorney, Form 935, except that an agent holding a valid and subsisting general power of attorney authorizing him to represent his principal in making, executing, and filing the income return, may submit a certified copy thereof in lieu of the authorization on Form 935. The taxpayer and his agent, if any, are responsible for the return as made and incur liability for the penalties provided for erroneous, false, or fraudulent returns. * * *