Sylvia H. THOMPSON, Appellant,

v.

Clark M. CLIFFORD, as Secretary of
Defense, et al., Appellees.

No. 20737.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 9, 1967.

Decided Dec. 13, 1968.

Burger, Circuit Judge, dissented in part.

Mr. Lawrence Speiser, Washington, D. C., with whom Messrs. Joel E. Hoffman and William Warfield Ross, Washington, D. C., were on the brief, for appellant.

Mr. James A. Strazzella, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Joseph M. Hannon and A. Lee Fentress, Jr., Asst. U. S. Attys., were on the brief, for appellees.

Before FAHY, Senior Circuit Judge, and BURGER and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal challenges the authority of the Secretary of the Army to bar interment of the remains of Robert G. Thompson in a national cemetery.[1] Thompson saw action during World War II in the Pacific Theater, where his "extraordinary heroism" won the Distinguished

---

1. Appellees are the Secretary and Deputy Secretary of Defense, the Secretary of the Army and certain of its personnel, and the Superintendent of Arlington National Cemetery. Successors to officials, originally named as parties, who are no longer in office are properly before us as appellees. F.R.A.P. 43(c) (1).

Service Cross [2] and approval for a battlefield commission as an officer. Before the commission could be effectuated, Thompson was disabled by malaria and tuberculosis contracted during service in New Guinea. This condition led to his honorable discharge and an award of wartime disability compensation.

After Thompson's death in 1965, appellant, his widow, had his body cremated and requested burial in Arlington National Cemetery. Appellant supplied all information required, the Army gave its official approval, and arrangements were made to convey the decedent's ashes to their final resting place. It was then —eight days before the interment date —that a story appeared in the press announcing the projected burial and recounting Thompson's post-war difficulties with the law.

Subsequent to his discharge from the Army, Thompson was convicted under the Smith Act [3] of conspiracy to advocate the violent overthrow of the government of the United States, and was sentenced to imprisonment for three years. After the Supreme Court affirmed his conviction,[4] he absconded, and for this he was convicted of criminal contempt.[5] An additional term of four years was imposed, to run consecutively to the original sentence.[6]

The post mortem publicity linking Thompson, the hero, with Thompson, the pariah, created an immediate stir. A member of Congress denounced the plan for his burial in Arlington Cemetery as "misplaced bureaucratic idealism." [7] On the day following, the Army notified appellant that the matter was under review. With doubt as to whether the then existing Army regulation purported to foreclose consummation of the plan, the Army promptly amended it to clearly cover the situation.[8] Simultaneously, the Army announced that both the old and the new regulations operated to defeat appellant's project,[9] and on the next day apologized to her for "any distress you may have had because of conflicting advices."

Appellant then brought suit in the District Court for declaratory and injunctive relief, and there, as here, the controversy centered upon the pertinent legislative and administrative specifications.[10] At the time of Thompson's

---

2. The citation accompanying the award read:

"For extraordinary heroism in action near Tarakena, New Guinea, on January 11, 1943. Volunteering to lead a small patrol in an attempt to establish a foothold on the opposite shore, Staff Sergeant Thompson swam the swollen and rapid Konembi River in broad daylight and under heavy enemy fire. Armed only with a pistol and hand granades, he assisted in towing a rope to the other shore where he remained under cover of the bank and directed the crossing of his platoon. Staff Sergeant Thompson then led the platoon against two enemy machine-gun emplacements which dominated the crossing, and wiped them out. The success of this action permitted the advance of the entire company and secured a bridge-head for the advance of the following units."

3. 18 U.S.C. § 2385.

4. *Sub nom.* Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), affirming 183 F.2d 201 (2d Cir. 1950).

5. 18 U.S.C. § 401.

6. United States v. Thompson, 117 F.Supp. 685 (S.D.N.Y.1953), aff'd, 214 F.2d 545 (2d Cir.), cert. denied 348 U.S. 841, 75 S.Ct. 48, 99 L.Ed. 663 (1954). See also United States v. Thompson, 261 F.2d 809 (2d Cir. 1958), cert. denied 359 U.S. 967, 79 S.Ct. 878, 3 L.Ed.2d 835 (1959). Thompson actually served a total of five years and one month.

7. 112 Cong.Rec. 904 (1966) (remarks of Representative Bennett).

8. See text *infra* at note 14.

9. See note 18, *infra*.

10. Appellees also filed in the District Court a motion to dismiss the action as one requiring but lacking the consent of the United States. That point, upon which the District Court did not rule, is reasserted here. However, appellant's claim is that the Secretary of the Army exceeded his statutory powers in promulgating and applying the exclusionary regulations, and that his co-appellees gave those regulations credence in their official ac-

death in 1965 and for many years previously, Congress had authorized the burial of honorably discharged soldiers in national cemeteries. "Under such regulations as the Secretary of the Army may * * * prescribe," read the statute in force in 1965, the remains of persons within described categories "may be buried in national cemeteries."[11] One of these categories embraced "[a]ny * * * former member of the Armed Forces who served on active duty * * and whose last such service terminated honorably."[12]

The Secretary of the Army, however, had promulgated a regulation, in vogue when Thompson passed away, prohibiting interment in a national cemetery of "[a] person otherwise eligible * * * who is convicted * * * of a crime or crimes, the result of which is * * * a sentence to imprisonment for 5 years or more."[13] In an obvious effort to avoid a contest as to whether Thompson's three- and four-year sentences constituted "a sentence * * * for 5 years or more" within the meaning of that provision, the Army's newly-formulated regulation, to which we have adverted,[14] stated that those convicted of Smith Act violations would be denied the burial privilege, and that "[s]eparate sentences served consecutively and which aggregate 5 years or more are disqualifying."[15]

With the facts substantially undisputed, the District Court entertained cross-motions for summary judgment and ruled in appellees' favor. Focusing upon the statutory language "the remains of the following persons *may* be buried in national cemeteries,"[16] the court felt that

> "The word 'may' is significant. The section does not provide that the remains of the following persons *shall* be entitled to be buried in national cemeteries. A different situation would be presented if such phrase had been adopted by Congress."[17]

Thus, said the court, the statute

> "* * * conferred upon the Secretary the right and the election to permit the

---

tivities; and the relief appellant seeks would confine them all within the ambit of lawful authority. We accordingly reject appellees' argument on this score. Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).

11. "Under such regulations as the Secretary of the Army may, with the approval of the Secretary of Defense, prescribe, the remains of the following persons may be buried in national cemeteries:

"(1) Any member or former member of the Armed Forces who served on active duty (other than for training) and whose last such service terminated honorably." 24 U.S.C. § 281.

12. *Id.*

13. "A person otherwise eligible for burial in a national cemetery who is convicted in a Federal, State, or United States military court of a crime or crimes, the result of which is the loss of United States citizenship or nationality, a sentence of death, or a sentence to imprisonment for 5 years or more will not be buried in a national cemetery. * * *" 30 Fed.Reg. 8996 (1965).

14. See text *supra* at note 8.

15. "(3) *Persons ineligible for burial:* (i) A person otherwise eligible for burial in a national cemetery but who was convicted in a Federal, State, or U. S. military court of a crime or crimes, the result of which was the loss of United States citizenship or nationality, a sentence of death, a sentence to imprisonment for 5 years or more, or in the case of any offense involving subversive activity listed in (a) of this subdivision, any sentence, will not be buried in a national cemetery.

"(a) The offenses involving subversive activities referred to [above] are those offenses for which punishment is prescribed * * * in the following provisions of title 18, United States Code: sections 792 * * * 2385 ['The Smith Act'].

"(b) * * * Separate sentences served consecutively and which aggregate 5 years or more are disqualifying. * * *" 31 Fed.Reg. 2834 (1966); 32 C.F.R. § 553.18(b) (3) (1968).

16. See note 11, *supra* (emphasis supplied).

17. Emphasis supplied.

burial of such persons as he deems proper, by regulation, of anyone in the various classes enumerated in the statute. It does not give a vested right to every member in each of the classes enumerated in the statute. It follows, hence, that the Secretary may adopt regulations determining as to who shall be entitled to be buried in national cemeteries provided he does not extend that privilege to anyone who is not deemed eligible by the statute."

The court further held that the Army's conclusion that Thompson's consecutive sentences constituted "a sentence to imprisonment for five years or more" was "a reasonable construction" of the regulation existent at Thompson's death, and that retroactive application of the amended regulation was permissible.[18]

■ We do not share the District Judge's confidence that the mere contrast of "may" and "shall" isolates congressional intent respecting the Secretary's administrative authority in this

area, or resolves the question whether the choice as to Thompson's burial in a national cemetery lies with the Army as well as with his widow. "May" ordinarily connotes discretion,[19] but neither in lay [20] nor legal [21] understanding is the result inexorable. Rather, the conclusion to be reached "depends on the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty." [22]

The factor looming largest upon examination of the instant problem is the obviously beneficent objective of the statute at bar. For honorable duty in the Armed Forces, Congress has bestowed upon defined classes of veterans and their families the values associated with eternal rest in a national cemetery. By this and a number of other benefits the Nation but strives to repay those whose service safeguards her very existence. Courts have traditionally read laws of this character liberally,[23] with a view

18. The court, as well as the Secretary of the Army, relied upon an opinion of the then Attorney General expressing the view that "the Secretary of the Army would be justified, under the applicable statute and regulations, in refusing to permit the decedent's remains to be interred in a national cemetery." As the Attorney General interpreted the law, the Secretary of the Army has "the authority, by regulation, to prescribe standards of eligibility for burial in a national cemetery." Moreover, it was the judgment of the Attorney General that "it could reasonably be concluded that Thompson was, within the meaning of [the 1965] regulation [note 13, *supra*], 'convicted in a Federal * * * court of a crime or crimes, the result of which was a sentence to imprisonment for 5 years or more. * * *'" The Attorney General also advised that the sentence aggregation provision in the Secretary's amended regulation, note 15, *supra*, could be invoked as a ban on Thompson's burial in Arlington Cemetery, and found "no occasion for separate discussion of" the provision therein excluding Smith Act violators.

19. Farmers' & Merchants' Bank of Monroe, N. C. v. Federal Reserve Bank, 262

U.S. 649, 662, 43 S.Ct. 651, 67 L.Ed. 1157 (1923) ; Luck v. United States, 121 U.S.App.D.C. 151, 155–156, 348 F.2d 763, 767–768 (1965) ; Lansdown v. Faris, 66 F.2d 939, 941 (8th Cir. 1933).

20. "Where the sense, purpose, or policy of a statute requires it, *may* as used in the statute will be construed as *must* or *shall*; otherwise *may* has its ordinary permissive and discretionary force." Webster's New International Dictionary (2d ed. 1942).

21. See the cases cited *infra* note 22.

22. United States ex rel. Siegel v. Thoman, 156 U.S. 353, 359, 15 S.Ct. 378, 39 L. Ed. 450 (1895). See also Ballou v. Kemp, 68 App.D.C. 7, 10, 92 F.2d 556, 559 (1937) ; Whalen Paper & Pulp Mills v. Davis, 53 App.D.C. 84, 86, 288 F. 438, 440 (1923). But see Hecht Co. v. Bowles, 321 U.S. 321, 326–327, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (holding that the use of "may" and "shall" in the same sentence of a statute implies that each was used purposefully).

23. Porter v. Aetna Cas. & Sur. Co., 370 U.S. 159, 162, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962) (disability benefits) ; United States v. Zazove, 334 U.S. 602, 610–611,

to spreading the boon broadly unless the legislature had manifested a desire to dole it out narrowly. We are unable to detect any reason why the very same considerations should not fully obtain here.

So it is that we find that the context of the statute summons the likely probability that Congress imposed upon the Secretary of the Army a nondiscretionary obligation respecting the burial of honorably discharged veterans. We now proceed to explore the statute's legislative and administrative history for evidence of such weight as might dispel that probability. Then, confronting plain indications of congressional purpose supporting appellant's thesis, and the conspicuous absence of those factors in the development of the regulations as would normally cause us to defer to the Secretary's construction of a statute he administers, we conclude that Congress conferred upon the decedent a right to burial in a national cemetery unconditioned by the Secretary's exercise of judgment. Because the Secretary lacked power to exclude Thompson's remains from interment in a national cemetery,[24] and without reaching other issues tender-

68 S.Ct. 1284, 92 L.Ed. 1601 (1948) (insurance); Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) (employment tenure); Walton v. Cotton, 60 U.S. (19 How.) 355, 358, 15 L.Ed. 658 (1856) (pension); Philippine Nat'l Bank v. United States, 112 U.S.App.D.C. 126, 128, 300 F.2d 718, 720 (1962) (insurance); United States v. Philippine Nat'l Bank, 110 U.S.App.D.C. 250, 251–252, 292 F.2d 743, 744–745 (1961) (insurance); Flanagan v. Young, 97 U.S. App.D.C. 119, 125, 228 F.2d 466, 472 (1955) (employment preference); Boone v. Fort Worth & D. Ry., 223 F.2d 766, 770 (5th Cir. 1955) (employment tenure); Mann v. Crowell-Collier Publishing Co., 239 F.2d 699, 701 (6th Cir. 1956) (employment tenure); In re Ayson, 14 F.Supp. 488, 489 (N.D.Ill.1936) (naturalization). See also Lawrence v. Shaw, 300 U.S. 245, 250, 57 S.Ct. 443, 81 L.Ed. 623 (1937); Carter v. United States, 131 U.S.App.D.C. —, 407 F.2d 1238 (July 26, 1968).

24. We confine our review and our decision, as we must, to the issues as defined by the administrative ruling under attack. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). See also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); American Trucking Ass'ns, Inc. v. United States, 364 U.S. 1, 14, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960); Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960). The reference of record to the Secretary's grounds is contained in the Army's letter to appellant confirming the Army's conclusion "that the ashes of your late husband * * * may not be buried in a national cemetery" and stating that "[t]he basis for this determination is set forth in the * * * opinion by the Attorney General." See *supra* note 18. The Attorney General viewed, as the sole bases for the Secretary's action, the provisions of the 1965 and 1966 regulations withdrawing the burial privilege from those convicted of crimes resulting in a sentence of five years or more, and to these provisions we are confined on this appeal.

We note, however, that there are two other proscriptions contained in the regulations which the Secretary thus discarded as predicates for his action. First, the 1966 regulations refuse burial to those convicted under the Smith Act, as was Thompson. See note 15, *supra*. Second, both the 1965 and 1966 regulations deny that privilege to those convicted of crimes "the result of which is the loss of United States citizenship or nationality." Like its successor, 66 Stat. 268 (1952), 8 U.S.C. § 1481(a) (9), Section 401(h) of the Nationality Act of 1940, 54 Stat. 1169 (1940), provides for loss of nationality upon conviction for "attempting by force to overthrow * * * the United States," and the gravamen of Thompson's Smith Act offense was conspiracy to advocate the violent overthrow of the United States government. In the past, the Army apparently took the position that Congress itself had made veterans who lost their citizenship ineligible for burial. See text *infra* at notes 99–104. But, since the Attorney General's opinion never mentioned the loss of nationality provision, and expressly disclaimed reliance on the Smith Act provision, they are beyond the purview of this litigation. "[A]n administrative

ed, we reverse the District Court's judgment and remand the case for further proceedings.

## I

*The 1872 and 1873 Cemetery Acts*

National cemeteries were given birth in 1862 when Congress granted power to the President to purchase land "to be used as a national cemetery for the soldiers who shall die in the service of the country," [25] a provision apparently limited in scope to burial of those dying on active duty in Civil War campaigns. A decade later, however, Congress twice enlarged the class of eligibles, first in 1872:

"* * * all soldiers and sailors honorably discharged * * * who may die in a destitute condition, *shall* be allowed burial in the national cemeteries * * *" [26]

and then in 1873:

"* * * honorably discharged [servicemen] who served during the late war * * * *may* be buried in any national cemetery * * * free of cost and their graves shall receive the same care and attention as the graves of those already buried." [27]

Appellees argue that the shift in language from "shall" to "may" represents a concomitant shift in meaning. By their interpretation, the 1872 statute insured the burial of all active servicemen dying destitute, while the 1873 act, though broadening eligibility, made the privilege wholly discretionary. One has little difficulty, however, in discerning the circumstances that eradicate support for this position.

It seems clear from the language of the 1873 statute that Congress, in extending the cemetery benefit to those veterans who could afford burial elsewhere, hardly intended to dissipate the benefit as to those who could not. Certainly we would expect that had Congress willed that incongruous result, it would have spoken much more clearly [28]—just as it had done previously—and recently—in the formulation of other legislation designed to care for deserving ex-servicemen. In 1851, when Congress established a Soldiers' Home for retired and disable Army veterans,[29] it not only defined eligibility [30] but also explicitly directed the automatic exclusion of otherwise eligible persons who had been convicted of felonies, and conferred administrative discretion to exclude others on the basis of express standards.[31] To us, the contrast between the two regulatory schemes is glaring.

order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., *supra,* 318 U.S. at 95, 63 S.Ct. at 462. Thus, we do not pass upon such questions as whether Congress made noncitizens ineligible for burial, or undertook to take away Thompson's citizenship, compare 68 Stat. 1146 (1954), or whether, if it did, such a forfeiture of citizenship could be constitutionally accomplished. See Afroyim v. Rusk, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

25. 12 Stat. 596 (1862).

26. 17 Stat. 202 (1872) (emphasis supplied).

27. 17 Stat. 605 (1873) (emphasis supplied).

28. See Helvering v. Hammel, 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303 (1941); United States v. Ryan, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224 (1931). *Cf.* FTC v. Jantzen, Inc., 386 U.S. 228, 236, 87 S.Ct. 998, 18 L.Ed.2d 11 (1967).

29. 24 U.S.C. § 49.

30. 24 U.S.C. §§ 49, 50.

31. "The benefits of the Soldiers' Home shall not be extended to any soldier in the regular or volunteer service, convicted of felony or other disgraceful or infamous crimes of a civil nature after his admission into the service of the United States; nor shall any one who has been a deserter, mutineer, or habitual drunkard be received, without such evidence of subsequent service, good conduct, and reformation of character, as is satisfactory to the commissioners." 24 U.S.C. § 50.

Other historical facts cast further doubt on any reading of the 1873 cemetery statute as a grant of wide discretionary powers to the Secretary of the Army. The administration of the cemeteries did not become the Secretary's function until three years later.[32] Not until 70 years after that was there a delegation of authority to establish administrative regulations.[33] There is no evidence of administrative exclusion of anyone for more than a half-century following the 1873 enactment,[34] and Congress has never set standards for administrative exclusion.[35] We are unable to find that the indefeasible burial privilege Congress gave in 1872 became administratively defeasible in 1873.[36]

### The 1948 Cemeteries Act

Without statutory authority, the Army had long extended burial privileges to members of the immediate families of eligible veterans.[37] It had also, since 1927, denied some otherwise eligible veterans the privilege because of conviction of crime. The latter course, pursued initially on an *ad hoc* basis, became the subject of an administrative regulation in 1947.[38]

In 1948, the Secretary requested congressional approval of certain practices initiated by him over the years in the oversight of the national cemeteries. Particular emphasis was placed upon the Secretary's long established custom of extending burial privileges to selected classes not made eligible by statute.[39] In a recommendation for confirmatory action in that area, Secretary of War Patterson implored Congress to enact "enabling legislation for the burial in national cemeteries of all members of the armed forces who die in the service or after having been honorably discharged therefrom, together with members of their immediate families as specified

32. Not until 1876 was maintenance of national cemeteries turned over to the Secretary of the Army. 19 Stat. 99 (1876).

33. 62 Stat. 234 (1948). See note 43, *infra*, and accompanying text.

34. The chief of the Memorial Division of the Quartermaster Corps was unable to determine whether a policy of excluding felons existed prior to 1906, and his search of the records between 1906 and 1926 produced no written evidence of any policy to that effect. The earliest denial of burial on the basis of a felony conviction that he found occurred in 1927. Thus, whether or not there were exclusions before 1906, the 21-year hiatus between 1906 and 1927 indicates that the modern-day practice of excluding felons had an independent start in 1927. The national cemeteries were established in 1862, note 25, *supra*, and appellees rely heavily on the act of 1873, note 27, *supra*.

35. Compare the statutory materials quoted or cited at notes 11, 35, 26 and 27, *supra*, and note 44, *infra*, and accompanying text.

36. We conclude similarly as to legislation enacted in 1920, upon which appellees place reliance. Congress then updated the law so that citizens who served with the armed forces of countries allied with the United States would be eligible for burial in national military cemeteries. 41 Stat.

552 (1920). This addition distinguished between veterans who had served the United States during wartime or had died destitute after peacetime service, on the one hand, and United States citizens who had previously served with the forces of a wartime ally, on the other. Those within the first class became eligible for burial simply upon production of honorable discharge papers, but the consent of the Secretary of War was made prerequisite to burial of those falling within the second class. Without legislative history available to enlighten us—and there is none—we fail to see how this legislation helps appellees' position. Rather, if it has any significance at all, it seems to add substance to appellant's argument.

37. "The authority for the burial of wives and widows was granted in 1890 and for minor children and unmarried adult daughters in 1904 and 1908, respectively. This authority was granted by the then Secretary of War, upon advice of the Judge Advocate General of the Army, in view of family relationship." H.R.Rep. No. 1678, 80th Cong., 2d Sess. 2 (1948) (letter from Secretary of War Patterson).

38. Office of The Quartermaster General, National Cemetery Regulations ¶ 22.d (1947). See note 45, *infra*.

39. H.R.Rep.No. 1678, 80th Cong., 2d Sess. 2–3 (1948).

therein, provided such burial is desired."[40]

With little debate [41] on the matter, Congress passed the 1948 amendments in substantially the same form requested: [42]

"[B]urial in national cemeteries of the remains of the following classes of persons is authorized under such regulations as the Secretary of the Army may prescribe: [43]

"(a) Any member or former member of the armed forces of the United States whose last service terminated honorably, by death or otherwise;

"(b) [A]ny citizen of the United States who, during any war in which the United States has been, or may hereafter be engaged, served in the armed forces of any government allied with the United States during such war, and whose last service terminated honorably, by death or otherwise; and

"(c) [T]he wife, husband, widow, widower, minor child, and, in the discretion of the Secretary of the Army, unmarried adult child of any of the persons enumerated in (a) and (b), herein * * *." [44]

Appellees would have us believe that these modifications subjected, for the future, eligibility for burial to regulations issued by the Secretary. This contention suffers fatally from the complete lack of any evidence that Congress knew of the Army's past exclusionary practices.[45] In contrast to the full explanation of the policy regarding burial of servicemen's families, the Army never told Congress that during a 20-year period it had turned down some statutory eligibles. We cannot hold that the grant to the Secretary of power to make regulations approved a policy of which Congress was not aware.[46]

Nor can we accept appellees' argument that the grant of rule-making authority

40. S.Rep.No. 903, 80th Cong., 2d Sess. 1 (1948), U.S.Code Cong.Serv.1948, p. 1537.

41. The Senate version, which both houses of Congress adopted after amendment by Representative Kean, was passed without objection. 94 Cong.Rec. 1689–90, 5195, 5300 (80th Cong., 2d Sess.1948).

42. In explaining one aspect of the bill, Senator Butler, its sponsor, stated:
"In the past, the custom has been to permit burial of the wife of a serviceman in a national cemetery in anticipation that sometime his body would be placed alongside hers. * * * It is a custom that has been followed by the Department for a long time, but it has been done without definite legal authority. The Department wishes to continue the custom which has prevailed in the past, but to have definite authority for doing so." 94 Cong. Rec. 1690 (1948).

43. This statute contains the first grant of authority to the Secretary of the Army to promulgate regulations concerning burial in national cemeteries.

44. 62 Stat. 234 (1948).

45. It has not been shown that either the Army's exclusionary practice or the cemetery regulations issued by its Secretary were made available to Congress at the time the 1948 changes were pending. The

general cemetery regulations were not published in the Federal Register until after the passage of the 1948 revisions. See 16 Fed.Reg. 11914–18 (1951). The regulation excluding felons was not published until the following year. See 17 Fed.Reg. 4482–83 (1952).
Moreover, the reports of both Houses of Congress mirror the lack of understanding that exclusion of felons had sometimes played a role in the Army's interment practice. Secretary Patterson's letter— seeking legislation enabling burial "of *all* members of the armed forces who die in the service or after having been honorably discharged therefrom" and their immediate relatives, text *supra* at note 40 (emphasis added)—constituted practically the entire Senate report. S.Rep.No. 903, 80th Cong., 2d Sess. (1948). The House report is even clearer: "It is a long-established custom to grant the privilege of burial in national cemeteries to *all* members of the armed forces who die in the service or after having been honorably discharged therefrom. * * * This bill gives statutory authority for practices followed for many years." H.R.Rep.No. 1678, 80th Cong., 2d Sess. 1 (1948) (emphasis supplied).

46. United States v. Calamaro, 354 U.S. 351, 359, 77 S.Ct. 1138, 1 L.Ed.2d 1394

deputized the Secretary to restrict statutory eligibility at will. If, indeed, Congress had so intended, its detailed specification in the statute of the classes of persons entitled to burial served considerably less than its normal purpose. It is historically more accurate to say that in extending burial rights to servicemen's relatives, Congress put an end to administrative improvisation in eligibility to the extent that it had been informed of it.

We think it clear that what Congress did in 1948 was to recognize previously ineligible groups which the Army was admitting to the cemeteries, to consent to their burial therein in the future, and to grant the Secretary power to make housekeeping regulations.[47] This conclusion is reinforced by the fact that Congress expressly delegated to the Secretary discretionary authority over burials within one—but only one—of the statutorily eligible classes.[48] In the face

of that explication, we do not read into the statute a grant of discretion over all.[49]

## The 1959 Cemetery Act

The latest revision of the legislation under scrutiny occurred in 1959, and the interment privilege was then enlarged once more,[50] consistently with the "major purpose * * * to broaden the categories of those eligible for burial in national cemeteries * * * "[51] There appears to have been little dispute over the additions; there were no hearings and both the Senate[52] and the House[53] reports reflected general agreement[54] in that objective.

There is nothing to indicate that in 1959, any more than in 1948, Congress was made aware that the Army had barred convicted felons from the cemeteries. And although it was in 1959 that the statutory reference to the Secretary of the Army, preceding the specifications

(1957); Helvering v. New York Trust Co., 292 U.S. 455, 468, 54 S.Ct. 806, 78 L.Ed. 1361 (1934); Pacific Power & Light Co. v. FPC, 87 U.S.App.D.C. 261, 264, 184 F.2d 272, 275 (1950); Fishgold v. Sullivan Drydock & Repair Corp., 154 F.2d 785, 790 (2d Cir.), aff'd 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

47. It was, of course, highly necessary that someone oversee the national cemeteries. Nothing could be more natural than for Congress to delegate that responsibility, and to confer it upon the Secretary of the Army, with power to promulgate regulations for that purpose. This administrative task involves a myriad of housekeeping details. The 1947 regulations cover 53 printed pages, only four of which deal—almost entirely by explication of the statutory provisions—with eligibility for interment. On the other hand, another six pages are devoted solely to specifications for privately procured monuments. Office of the Quartermaster General, National Cemetery Regulations (1947).

48. "[B]urial in national cemeteries of the remains of the following classes of persons is authorized under such regulations as the Secretary of the Army may prescribe: * * * (c) the wife, husband, widow, widower, minor child, and, in the discretion of the Secretary of the Army, unmarried adult child of any of the per-

sons enumerated in (a) and (b) herein * * *." 62 Stat. 234 (1948).

49. See Hecht Co. v. Bowles, *supra* note 22, 321 U.S. at 326–327, 64 S.Ct. 587; Farmers' & Merchants' Bank of Monroe, N. C. v. Federal Reserve Bank, 262 U.S. 649, 663, 43 S.Ct. 651 (1923); United States ex rel. Siegel v. Thoman, *supra* note 22, 156 U.S. at 360, 15 S.Ct. 378.

50. 73 Stat. 547 (1959), 24 U.S.C. § 281, quoted in part *supra* note 11.

51. H.R.Rep.No. 1117, 86th Cong., 1st Sess. 1 (1959), U.S.Code Cong. & Admin.News 1959, p. 2523. See, providing similarly, S.Rep.No. 382, 86th Cong., 1st Sess. 1 (1959).

52. S.Rep.No. 382, 86th Cong., 1st Sess. (1959).

53. H.R.Rep.No. 1117, 86th Cong., 1st Sess. (1959).

54. There was some debate on the floor of the House when the bill was presented. Representative Gross was concerned that this amendment would too greatly expand the number of persons who could be interred in national cemeteries. The bill's sponsor, Representative Aspinall, predicted that there were relatively few individuals who would be included in this new group of those eligible for burial. See 105 Cong. Rec. 18416 (1959).

of eligibility, was cast in its current form,[55] the legislative history is barren of any reason for the change.

■ Because, however, the felony exclusion incorporated in the Army's 1947 regulations[56] was published in the Federal Register in 1952,[57] appellees urge that the 1959 amendments reinforced the Secretary's power to perpetuate that exclusion. For this they rely on the canon of statutory construction that reenactment without change after a course of administrative interpretation is tantamount to legislative ratification of the interpretation.[58] As we have indicated,[59] "[t]he rationale of that canon must be, either that those in charge of the amendment are familiar with existing rulings, or that they mean to incorporate them,"[60] and no evidence appears that the felony exclusion rule came to the attention of Congress. Additionally, the 1959 revisions were meant to "broaden," not narrow, "the eligibility requirements for burial in national cemeteries,"[61] and in congressional understanding existing eligibility was unaffected by conviction for crime.[62] Under these circumstances we see no basis for concluding that the stat-

utory changes in 1959 amounted to an affirmation of the Army's policy of rejecting felons.

### The 1962 and 1965 Hearings

■ In the course of congressional hearings in 1962 and 1965, a version of the Army's felony exclusion regulation appeared in one of the House documents. Appellees contend that this regulation was specifically brought to the attention of Congress and that no question was raised as to its validity, with the result that Congress ratified the Secretary's interpretation of the statute as a grant of power to bar felons though otherwise eligible. Thus appellees at this point rely upon inaction, rather than on action as they previously did,[63] as the source of legislative approval of the administrative technique under assault, and they do so without avail. Legislative silence cannot mean ratification unless, as a minimum, the existence of the administrative practice is brought home to the legislature.[64] Appellees' argument[65] fails because a review of the 1962 and 1965 hearings shows plainly that Congress was not adequately informed that

55. "Under such regulations as the Secretary of the Army may, with the approval of the Secretary of Defense, prescribe * * *." 73 Stat. 547 (1959), 24 U.S.C. § 281, quoted in part *supra* note 11.

56. Note 38, *supra*.

57. Note 46, *supra*.

58. *E. g.,* Commissioner v. Estate of Noel, 380 U.S. 678, 682, 85 S.Ct. 1238, 14 L. Ed.2d 159 (1965).

59. Note 46, *supra*.

60. Fishgold v. Sullivan Drydock & Repair Corp., *supra* note 46, 154 F.2d at 790.

61. Text *supra* at note 51.

62. In practically identical language the Senate and House reports state the understanding that existing law authorizes the burial in national cemeteries of *"any* member or former member of the armed services * * * whose last services terminated honorably by death or otherwise." S.Rep.No. 382, 86th Cong., 1st Sess. 1 (1959); H.R.Rep.No. 1117, 86th Cong., 1st Sess. 2 (1959) (emphasis supplied).

63. Text *supra* at notes 45–46, 55–62.

64. D. C. Federation of Civic Ass'ns v. Airis, 129 U.S.App.D.C. 125, 391 F.2d 478 (Feb. 15, 1968). Compare the cases cited note 46, *supra*.

65. In the cases cited by appellees and in others involving ratification by acquiescence, principal reliance was placed upon the circumstances that the disputed administrative practices were specifically brought to the attention of Congress in hearings, Power Reactor Dev. Co. v. International Union of Elec., etc., Workers, 367 U.S. 396, 408–409, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Cory Corp. v. Sauber, 363 U.S. 709, 712, 80 S.Ct. 1331, 4 L.Ed.2d 1508 (1960); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 313–314, 53 S.Ct. 350, 77 L.Ed. 796 (1933), or were systematically reported to Congress over a period of time. Rose v. McNamara, 126 U.S.App.D.C. 179, 375 F.2d 924, 928–929, cert. denied 389 U.S. 856, 88 S.Ct. 70, 19 L.Ed.2d 121 (1967).

the Secretary was excluding from burial anyone made eligible by statute.

For the 1962 hearings, held by the Subcommittee on National Parks of the House Committee on Interior and Insular Affairs,[66] a background report was prepared. That report, Committee Print No. 15—"Data on National Cemeteries,"[67] focused, as did the hearings,[68] on the overall problem created by the fact that the number of persons eligible for burial exceeded by millions the number of available grave sites. The Subcommittee wished to examine possible solutions to this problem, such as opening more cemeteries or curtailing the categories of persons entitled to the privilege.[69] Its chairman, at the opening of the hearings, asked the witnesses to "confine their testimony to the general situation"[70] and, as might be expected, the felony exclusion rule, affecting only a small number of cases, was not brought up in testimony or questioning. Correspondingly, Committee Print No. 15 barely touched on the felony exclusion. Only the then current regulation, comprising one short paragraph, appeared in the midst of 18 pages of background data on the subject at hand—the gap between supply and demand of interment facilities.[71]

On the other hand, the Subcommittee was presented much more prominently with testimony indicating that burial was well-nigh automatic. As the Army's representative at the hearings stated, in response to a question by the chairman of the Subcommittee, "[e]ligibility for burial in the Arlington National Cemetery is determined by law. We have no control over that."[72] Later, in discussing the especially acute problem of lack of space in Arlington National Cemetery, Representative Taylor asked about the requirements for burial there:

"Mr. Hughes [Assistant Director for Legislative Reference of the Bureau of the Budget]: * * * I think eligibility relates solely to the fact of military service and an honorable discharge.

\* \* \* \* \* \*

"Mr. Taylor: Then any veteran, honorably discharged veteran, that desires to be buried at Arlington could, upon request, be buried there?

"Mr. Hughes: Yes, sir."[73]

Thus, the 1962 hearings, as a vehicle to bring the Secretary's claim of power to the attention of Congress, stands in sharp contrast to factual situations wherein courts have found ratification by acquiescence.[74] Given the relative unhelpfulness of the felony exclusion regulation to the hearing's inquiry, its brief mention in a large report, the inconsistent testimony,[75] and the failure of anybody to note the inconsistencies or even to speak of the regulation, we cannot say that its existence was brought sufficiently to the Subcommittee's attention.[76]

Similarly, we must reject appellees' claim that the felony exclusion policy was brought to the attention of Congress in hearings held in 1965 by the House

---

66. Hearings on National Cemetery Policy Before the Subcomm. on National Parks of the House Comm. on Interior and Insular Affairs, 87th Cong., 2d Sess., ser. 18 (1962) [hereinafter cited as 1962 Hearings].

67. House Comm. on Interior and Insular Affairs, 87th Cong., 2d Sess., Data on National Cemeteries (Comm. Print No. 15, 1962) [hereinafter cited as Committee Print].

68. 1962 Hearings at 1–4.

69. *Id.*

70. *Id.* at 2.

71. Committee Print at 5.

72. 1962 Hearings at 29.

73. 1962 Hearings at 69.

74. See the cases cited *supra* note 65.

75. Compare cases refusing to find ratification through reenactment where the legislature acted after inconsistent administrative interpretation. *E.g.*, Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 216, 61 S.Ct. 475, 85 L.Ed. 783 (1941).

76. See the cases cited *supra* notes 46 and 64.

Committee on Interior and Insular Affairs.[77] These hearings, lasting seven days, concerned the activities of the Department of Interior. As that department and the Army had cooperated in the operation of some cemeteries,[78] a part of one day's hearings was devoted to a briefing on national cemetery policy by an officer of the Quartermaster Corps.[79] In response to a question, this officer referred to one section—not the felony exclusion section—of Committee Print No. 15.[80] He offered to supply a copy to the Committee, but there is no indication that this was done before adjournment.[81] The hearing proceeded to another subject, and Committee Print No. 15 was never again mentioned.[82] The adjournment took place a short while later,[83] so that even if the document was distributed to the Committee generally, in the circumstances it is unlikely that any member would have had an opportunity to identify the brief paragraph on felony exclusion, let alone examine its possible significance.

■ Finally, appellees would have us find congressional ratifications of the Secretary's felon exclusion practice in the passage since 1947 of appropriation bills for the maintenance of the national cemeteries. But ratification by appropriation, no less than ratification by acquiescence, requires affirmative evidence that Congress actually knew of the administrative policy.[84] As we said recently, "ratification by appropriation is not favored and will not be accepted where prior knowledge of the specific disputed action cannot be demonstrated clearly."[85] Moreover, to constitute ratification, an appropriation must plainly show a purpose to bestow the precise authority which is claimed."[86] That Congress supports financially the operation of the national cemeteries does not imply that it supports every aspect of their administration by the Army.[87]

## II

■ While a "right clearly created by statute cannot be taken away by regulation," [88] when the statutory meaning is in doubt "[t]he interpretation placed on [it] by those charged with its administration," whether or not ratified or acquiesced in by the legislature, "must be given weight. * * * " [89] Just how much weight will, however, depend upon the presence of a number of factors which "give it power to persuade, if lacking power to control." [90] Many such factors are absent here—so many as to leave us unconvinced that we should bow to the Secretary's interpretation.

77. Hearings on Policies, Programs, and Activities of the Department of the Interior Before the House Comm. on Interior and Insular Affairs, 89th Cong., 1st Sess., ser. 1, pt. 2 (1965).

78. *Id.* at 367.

79. *Id.* at 365–415.

80. *Id.* at 387.

81. *Id.* The document was reproduced in the printed versions of the hearings. *Id.* at 388–405.

82. *Id.* at 403.

83. *Id.* at 415.

84. D.C. Fed. of Civic Ass'ns v. Airis, *supra* note 64, 391 F.2d at 481–482 and cases there cited.

85. *Id.* at 482.

86. Ex parte Endo, 323 U.S. 283, 303 n. 4, 65 S.Ct. 208, 89 L.Ed. 243 (1944). See also Greene v. McElroy, 360 U.S. 474, 504, 505, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ; Maun v. United States, 347 F.2d 970, 978 (9th Cir. 1965).

87. D.C. Fed. of Civic Ass'ns v. Airis, *supra* note 64, 391 F.2d at 482; cases cited note 86, *supra.*

88. Northern Natural Gas Co. v. O'Malley, 277 F.2d 128, 134 (8th Cir. 1960). See also United States v. Morton Salt Co., 338 U.S. 632, 647, 70 S.Ct. 357, 94 L.Ed. 401 (1950) ; Miller v. Commissioner of Internal Revenue, 237 F.2d 830, 836 (5th Cir. 1956).

89. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

90. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

 Administrative construction is less potent than it otherwise would be where it does not rest upon matters peculiarly within the administrator's field of expertise.[91] It could hardly be suggested that the Secretary is more capable than the Congress to decide who should be buried in national cemeteries. Moreover, the Secretary's *ex parte* ruling before us is "not entitled to the weight which is accorded interpretations by administrative agencies entrusted with the responsibility of making *inter partes* decisions."[92] And an administrative interpretation of a statute carries its greatest thrust "when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."[93] The Army's felony exclusion policy was initiated 65 years after the national cemeteries were established, and 54 years after the passage of the act which appellees claim first gave them discretion over eligibility for burial.[94]

 Equally important, the reasoning behind the felony exclusion policy sounds more like administrative invention—witness the extension of burial privileges to relatives [95]—than statutory construction. "Administrative determinations must have a basis in law" and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation.[96] Here, although the Army has asserted the power to exclude otherwise eligible veterans since 1927 [97] and has promulgated regulations to that effect since 1947,[98] the basis upon which it relied for this power remained at best obscure until this litigation arose. The administrative history of the felony exclusion provides us with but four clues: two statements by the Assistant Secretary of War written in 1927 and 1928, a letter transited to the American Legion in 1944, and a study by the general counsel of the Quartermaster Corps in 1950. And we find that only one document, the letter to the American Legion, evinces a definite attempt at statutory interpretation.

Replying to an inquiry from the American Legion, the Army, on August 17, 1944, wrote:

"[R]egarding the burial in a national cemetery of an honorably discharged World War I veteran who subsequently committed a felony and died in a State Penitentiary, please be advised that

---

91. Social Security Bd. v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Skidmore v. Swift & Co., *supra* note 90, 323 U.S. at 139, 65 S.Ct. 161; ICC v. Service Trucking Co., 186 F.2d 400, 402 (3d Cir. 1951).

92. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 290, 66 S.Ct. 1105, 1114 (1946). See also Skidmore v. Swift & Co., *supra* note 90, 323 U.S. at 139, 65 S.Ct. 161.

93. Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358 (1933). See also Power Reactor Dev. Co. v. International Union of Elec., etc., Workers, *supra* note 63, 367 U.S. at 408, 81 S.Ct. 1529.

"Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise. But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." FTC v. Bunte Bros., 312 U.S. 349, 352, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941).

"The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant * * *." United States v. Morton Salt Co., *supra* note 88, 338 U.S. at 647, 70 S.Ct. at 366.

94. See note 34, *supra*.

95. See text *supra* at note 39.

96. Social Security Board v. Nierotko, *supra* note 91, 327 U.S. at 369, 66 S.Ct. at 643. See also Skidmore v. Swift & Co., *supra* note 90, 323 U.S. at 140, 65 S.Ct. 161; Jewell Ridge Coal Co. v. Local No. 6167, UMW, 325 U.S. 161, 169, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945).

97. Note 94, *supra*.

98. Note 38, *supra*.

the policy of the Department is to deny burial to such veterans for the following reasons:

"1. The prerequisites for burial in a national cemetery are that the deceased must be a citizen of the United States and must have served his country honorably;

"2. A person who commits a felony is not considered as having served his country honorably and, upon his commitment to a penitentiary, loses his citizenship thereby depriving him of all privileges of a citizen, including burial in a national cemetery and the furnishing of a Government headstone to mark his grave."

This response, badly misreading the statute, makes several critical errors of law. Congress made an "honorable discharge" from the Armed Forces, not subsequent service of one's country "honorably," a prerequisite for burial. The words are similar, but obviously the meanings are very different. There is no statutory requirement that veterans of the Armed Forces of the United States seeking burial in national cemeteries be citizens;[99] and aside from the question whether such a condition could be read into the statute, felons do not, as a general rule, lose their citizenship.[100]

The same errors are also reflected in the earlier 1928 statement by the Assistant Secretary of War. He wrote that where an otherwise eligible veteran "committed an offense which resulted in his conviction of a felony and confinement in a penitentiary (and forfeiture of his citizenship), that fact would serve to forfeit his right to burial in a national cemetery." Thus he too apparently saw commitment to a penitentiary as necessarily depriving a veteran of citizenship and robbing him of burial rights by legal forfeiture, not by exercise of the Secretary's discretion.[101]

The Army's 1950 policy and legal study apparently continued to interpret the cemetery statute to reject noncitizens, but recognized that conviction for a felony generally does not deprive one of citizenship. The Nationality Act of 1940 [102] and its successor [103] did, however, purport to revoke the citizenship of those convicted of desertion in wartime, treason, or attempt to overthrow the government. Correspondingly, from this study emanated a decision to deny burial in cases where loss of citizenship resulted from conviction of any of these crimes. We need not decide whether such a regulation would be valid, or would serve to exclude Thompson, because conviction for a crime resulting in loss of citizenship was not the basis for the Secretary's action.[104] But it is clear that the reasoning evolving in the 1950 study in no way supports a rule excluding all felons, or a rule keyed to the length of the felon's sentence.

Whether or not a result of the 1950 study, when the 1947 cemetery regula-

99. See 24 U.S.C. § 281(a) (1), quoted in part *supra* note 11.

100. See Afroyim v. Rusk; Kennedy v. Mendoza-Martinez; Trop v. Dulles, *supra* note 24.

101. Only a fragment of the 1927 statement appears in the record. In a deposition submitted by an official of the Quartermaster Corps, we are told:
"On 21 June 1927, a request was made for permission to bury in Arlington National Cemetery the remains of an honorably discharged veteran awaiting execution after having been convicted of rape. The Quartermaster General recommended to the Assistant Secretary of War that the individual be refused burial in Arlington National Cemetery or any other national cemetery by reason of his felony conviction, albeit he was otherwise entitled to such burial. This recommendation was concurred in by the Assistant Secretary of War on the grounds of the peculiar atrocious nature of the crime for which he will be executed. For this reason, the remains of this veteran were excluded from burial in Arlington National Cemetery."

102. 54 Stat. 1169.

103. 8 U.S.C. § 1481(a) (9).

104. See note 15, *supra*.

tions first appeared in the Federal Register in 1951,[105] the provision excluding felons was omitted. Then in 1952, inquiry was made as to the eligibility for burial of an individual awaiting execution in a state penitentiary. According to an affidavit submitted on behalf of appellees, "the Secretary of the Army directed the preparation of a regulation for immediate adoption which would prevent such individual from being interred in a national cemetery. * * *" The changed regulation,[106] in essence, barred burial of persons convicted of any crime "the result of which was loss of United States nationality or the maximum penalty for which was death or fifteen years or more imprisonment." The record indicates nothing as to the authorization, if any, the Secretary relied upon in promulgating this regulation.

 In sum, we discover weaknesses in the proffered administrative construction that would in any event militate against its acceptance. More crucially, we find from the cited evidence a course of action for which the administrators sometimes gave fallacious justifications, and at other times no justification at all. These circumstances in combination lead us to the conclusion that, to the extent that the Army's exclusionary practice purports to construe the congressional specifications for burial in national cemeteries, it is entitled to no weight in this litigation.

### III

 By congressional command, "[a]ny * * * former member of the Armed Forces who served on active duty * * * and whose last such service terminated honorably" may be buried in a national cemetery.[107] The question we have addressed is whether a soldier honorably discharged after active duty can, for later conviction of felony, be denied that privilege "[u]nder such regulations as the Secretary of the Army may * * * prescribe." [108] The statutory language, read liberally, foretells a negative answer, and the legislative history of the statute, as we have seen, strongly supports that answer.[109] We conclude that Congress did not empower the Army to determine who are or are not worthy of interment in national cemeteries.

Robert G. Thompson served actively in the Army for nearly two years, and earned his honorable discharge. Though he later became a felon, he remained an honorably discharged veteran of the Pacific campaigns. We hold that the Army could not properly prevent burial of his remains in a national cemetery.

In so deciding, we do not intimate that Congress sought thereby to condone criminality. We discern only an absence of congressional purpose to superimpose upon the criminal law a forfeiture of the burial privilege as an added deterrent to antisocial activity. Within the limits of the Constitution, it is for Congress to weigh the gains and losses consequent upon a deprivation of civil privileges as a method for regulating conduct. But where Congress has willed that course, it has spoken in unmistakable terms.[110] And here, very significantly, we think, it did not do so.

We reverse the judgment of the District Court, and remand the case for fur-

---

105. Note 45, *supra*.

106. Note 45, *supra*.

107. 24 U.S.C. § 281, quoted in part *supra* note 11.

108. *Id.*

109. And see United States v. United Verde Copper Co., 196 U.S. 207, 215–216, 25 S. Ct. 222, 49 L.Ed. 449 (1905); Morrill v. Jones, 106 U.S. 466, 1 S.Ct. 423, 27 L.Ed. 267 (1883).

110. Compare 5 U.S.C. § 2282(a) (1) (forfeiture of annuity or retired pay); 24 U.S.C. § 50, quoted *supra* note 31 (forfeiture of benefits of Soldiers' Home); 38 U.S.C. § 3505 (forfeiture of veteran's benefits); 42 U.S.C. § 402(u) (forfeiture of social security benefits).

ther proceedings not inconsistent with this opinion.

Reversed and remanded.

FAHY, Senior Circuit Judge (concurring).

I concur fully in the thoughtful and learned opinion of Judge Robinson for the court. The Constitution places the control of these properties of the United States in the Congress:

The Congress shall have power to dispose of and to make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; * * *

U.S.Const. art. IV, § 3.

Thus, the executive branch of the Government has only such authority over the national cemeteries as is delegated to the Executive by the Congress. It was natural for the Congress to delegate to the Secretaries authority to formulate regulations for the maintenance and administration of the cemeteries. In doing this the Congress at the same time described the persons whose remains could be buried there. The remains of Robert G. Thompson come within the persons described. The Secretaries accordingly lack authority to exclude them. The grant to the Secretaries of regulatory authority essential to the maintenance and administration of the cemeteries would seem to demonstrate that this responsibility of the Secretaries is not one to create classes which exclude the remains of some of those whose remains have been designated in the same legislation as eligible for burial.

The problem of legislative ratification is fully covered by Judge Robinson. To support the position of the Secretaries on this branch of the case would extend the theory of ratification to cover prior legislative approval of unknown, and unratified, classifications from time to time made by the Secretaries within the particular classifications the Congress has itself made by duly enacted legislation.

BURGER, Circuit Judge (concurring in part and dissenting in part):

I cannot join in the reasoning of the court that "the Secretary lacked power to exclude Thompson's remains from interment in a national cemetery * * * [because] * * * Congress conferred upon the decedent a right to burial * * * unconditioned by the Secretary's exercise of judgment."

Congress, on the contrary, specifically provided that the right was conditioned by "such regulations as the Secretary of the Army may * * * prescribe * * *" 24 U.S.C. § 281. I suggest that the majority is simply substituting its personal views of public policy for the policy decisions of the Legislative and Executive branches of government—and unnecessarily so because of narrow grounds to the same end. Neither the language of the statute nor its legislative history warrants the majority's conclusion.

I would reach the result achieved by the majority on the narrow ground that the Secretary made an overly and unnecessarily broad interpretation of his own regulation governing those sentenced to 5 year prison terms. The rationale behind such cut-off points is traditionally to single out those offenses which are so serious that they result in long-term sentences. To cumulate sentences as the Secretary does here brings within the scope of the regulation those individuals who, although they have been sentenced for substantial terms, have no single sentence of 5 or more years. I have very grave doubts that an exclusion can be justified by adding up the total of sentences to bring a case under the five year provision.

I would therefore remand the case to the Secretary with directions to reconsider his action in light of our view of his application of the regulation to *separate* sentences, each of which was for less than 5 years.